His Excellency, Vincente CUESNON-GLE, O.P., et al., Plaintiffs, Appellants,

v.

Hector R. RAMOS, Secretary of the Department of Consumer Affairs of the Commonwealth of Puerto Rico, Defendant, Appellee.

No. 85–1068.

United States Court of Appeals, First Circuit.

Heard Oct. 3, 1985.

Decided Dec. 30, 1987.

Luis R. Davila–Colon, Hato Rey, P.R., with whom Juan M. Garcia Passalacqua and Iraelia Pernas–Davila, San Juan, P.R., were on brief, for plaintiffs, appellants.

Luis Roberto Pinero, Hato Rey, P.R., Frank Zorrilla Maldonado, San Juan, P.R., and Ruben T. Nigaglioni, Hato Rey, P.R., were on brief for Asociacion de Colegios y Universidad Privada de Puerto Rico, Inc., amicus curiae.

Mejore Rivera Rodriguez with whom Americo Serra, Acting Sol. Gen., San Juan, P.R., was on brief, for defendant, appellee.

Before CAMPBELL, Chief Judge,[*] COFFIN and BOWNES, Circuit Judges.

COFFIN, Circuit Judge.

This litigation, commenced more than six years ago, comes before us now for the third time. Though only $217 dollars are actually at stake in the dispute, this case has been a crucible for testing the application of interacting doctrines guiding relations between federal and state courts. The procedural history of the litigation could have come straight from a textbook on federal jurisdiction; it has provided the opportunity to examine the current complexity and confusion of "our federalism" in the shadow of *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

Our certification of state law questions to the Supreme Court of Puerto Rico has elicited a thoughtful set of responses concerning the interrelationship of our two courts. In this opinion, we attempt to continue the dialogue—to the end that, within the constraints of current caselaw, we may realize the maximum feasible mutual benefits of the policies of avoiding constitutional issues where possible and deferring to state tribunals on issues of state law.

Our discussion consists of the following parts. Part I rehearses the facts of the case and the proceedings up until certification. Part II summarizes the reasoning of the Supreme Court of Puerto Rico in its refusal to answer the certified questions. Part III focuses on the implications of the response of the Supreme Court of Puerto Rico for the continued viability of the certification process. Part IV deals with restraints imposed on the federal courts by *Pennhurst* that further limit the usefulness of certification. Finally, Part V addresses the federal constitutional issue we had identified at an earlier stage in this litigation.

I. Facts and Proceedings

In August, 1980, a strike of non-teaching employees occurred at Universidad Central de Bayamon (UCB) in Puerto Rico. UCB is a coeducational, private, non-profit Catholic University, conducted under the auspices of the Order of Dominican Fathers. Classes had been scheduled to start on August 16th, but did not in fact begin until August 25th. Although courses continued with what was later described as "relative normalcy," several classes had to be cancelled for lack of professors as a result of the labor dispute. After the strike ended, eight students, claiming breach of contract, filed complaints before the Council of Higher Education. When these complaints were dismissed, the students filed claims with the Puerto Rican Department of Consumer Affairs (DACO), invoking a consumer protection law that had been enacted to regulate product liability and contract protection for consumer services. The alleged breaches of contract included changing the opening dates for classes, reducing student services, altering class and course schedules, discharging employees, suspending students, substituting professors, refusing to allow a student assembly, and refusing to reimburse registration fees.

---

[*] The panel originally hearing this appeal included, in addition to Judges Coffin and Bownes, Judge Davis of the Federal Circuit, sitting by designation. Because of Judge Davis' illness and convalescence, he withdrew from the panel before any work on this case. Chief Judge Campbell replaced him and has read all the briefs.

## A.

UCB raised numerous objections to DACO's jurisdiction over the matter, among them that DACO was barred by the doctrine of separation of church and state from adjudicating the case. When its objections were overruled, UCB voluntarily withdrew from the DACO administrative hearing without offering any evidence. UCB reasoned that any further involvement on its part could have been interpreted as a submission to DACO's authority and as a waiver of UCB's constitutional rights.

Following the hearing, on October 28, 1981, DACO reaffirmed its jurisdiction over the students' contract actions, and dismissed all of the complaints except one. As to that single complaint, DACO ordered the return of $217 in registration fees to one student, Froilan Montfort Seijo.

In contrast to the other complainants, Montfort had crossed the picket lines and tried to attend classes. When at first it seemed that no classes were going to take place, Montfort attempted to withdraw his registration, but was advised not to do so by the Registrar's Office, by whom he was assured of an imminent normalization of classes. When classes were resumed, two of the five courses for which Montfort had registered were cancelled. One of those cancelled was a graduation prerequisite for Montfort. There is also some evidence that teachers and sections were changed occasionally in those of Montfort's classes that remained. Unlike the other complainants, Montfort was at no time suspended by the University; in DACO's words, he was merely "hindered from attending classes." DACO ruled that Montfort, having paid his registration fees, expected to be rendered some services in accordance with the University Catalogue. With the "understand[ing]" that such Catalogue was the "Law among the parties" for contractual purposes, DACO applied certain articles of the Civil Code of Puerto Rico and concluded that because Montfort had fully complied with his portion of the "obligation" between the parties, he had the "right to demand compliance or the resolution of the obligation" from UCB.

On November 5, 1981, UCB filed before DACO a Motion for Reconsideration, in which it reiterated its jurisdictional arguments. In a further submission on November 16th, UCB focused on the absence of statutory authority for DACO's actions, on DACO's alleged misreading of the Catalogue "contract," and on DACO's alleged misinterpretation of the facts.

## B.

Before the motion for reconsideration was decided, the President and trustees of UCB filed suit in the federal district court in Puerto Rico in December of 1981, seeking nullification of DACO's ruling and an injunction preventing DACO from further interference in the University's affairs. UCB alleged at least three separate grounds for relief: first, that DACO's actions violated the free exercise clause of the First Amendment and the parallel section of the state constitution, because of excessive government entanglement with a religious institution; second, that, assuming there was no constitutional violation, DACO's organic statute did not provide the agency jurisdiction over claims involving universities; and third, that even if DACO did have statutory jurisdiction over the University which was not constitutionally barred, and assuming that the Catalogue could be construed as a contract between university and student to which the consumer protection law would apply, that DACO nonetheless misread that Catalogue to provide for liability in this case, i.e., that DACO erred in its contract interpretation.

The District Court for the District of Puerto Rico granted summary judgment for the University on October 27, 1982. Without addressing what we shall herein denominate the "statutory" and "contract" claims, the district court decided that UCB had suffered a violation of its First Amendment free exercise rights as a result of DACO's "excessive entanglement in the university's affairs."

## C.

This court, on August 10, 1983, reversed the holding of the district court, ruling that the UCB was not a true parochial school for First Amendment purposes, and that the decisions which prompted DACO's actions were "totally unrelated to any religious aspects of UCB's mission." *Cuesnongle v. Ramos,* 713 F.2d 881, 884 (1st Cir.1983).

We noted, however, that there was a possible infringement upon UCB's free *speech* rights, insofar as there exists a "zone of First Amendment protection for the educational process." *Id.* The constitutional issue was identified as: "whether and to what extent a university, engaged in the highly important and complex enterprise of teaching, should properly be subject to state regulation by an administrative body established to protect consumers from defective products and ... 'undesirable practices.' " *Id.* at 886. We suggested that constitutional concerns might be particularly implicated because DACO was "subject to review only for errors of law and findings not supported by substantial evidence," and because the system grants administrative control to "a less than judicial body [DACO]" which is not "specialized" or "particularly qualified" in the area. *Id.* We upheld the district court's injunction preventing DACO from enforcing its judgment, and remanded the case to the district court to permit UCB to amend its complaint to reflect the "freedom of educational process" issue. *Id.*[1]

## D.

On September 27, 1983, UCB amended its complaint to allege that DACO had "meddl[ed] in plaintiffs' educational ... affairs," in violation of UCB's freedom of speech, freedom of association, and due process rights. The state "contract" and "statutory" claims remained as express, albeit minor, portions of the complaint. In addition to a request that DACO's order of reimbursement be annulled, UCB also asked for additional relief in the form of an injunction "permanently enjoining, forbidding and restraining defendants from interfering, meddling, encroaching or entangling with or in the internal affairs and educational process and mission of Plaintiffs."[2]

On the basis of submitted stipulated facts, the district court denied UCB's petition on December 21, 1984. The court began its analysis by addressing the statutory issue of DACO's jurisdiction. It correctly identified that issue as whether students *qua* students are "consumers" of "services" "within the purview of the statute." Though the consumer protection statute does not itself provide definitions of either of these terms, the legislative history suggested that "services" should be used "as it is understood in the consensus of the Puerto Rican community," and that this determination had to be made on a case-by-case basis, in light of the specific circumstances of each case. The district court held that "under ordinary circumstances and conditions a person matriculating at a university establishes a contractual relationship with the university," and that the terms of the contract "are expressed in the university's charter and the promulgated regulations governing student conduct." Thus, the court decided that DACO did have statutory jurisdiction to resolve contract disputes between the university and its students.

The district court acknowledged that the university was protected by a constitution-

---

1. In dictum, this court expressed skepticism that DACO had properly interpreted the University Catalogue. *Id.* at 885–86. We dealt at length on DACO's "decision on the merits" as a way of demonstrating the possible first amendment concerns implicated by DACO's "inability to comprehend the nature of the question it faced." *Id.* at 886. We did not directly address whether this possible misreading of the "contract" in itself warranted overturning DACO's decision. Similarly, though we noted the incongruity of applying to a university setting the provisions of a consumer protection statute, *id.* at 886 & n. 4, we did not consider whether DACO's organic statute provided the agency with jurisdiction over this type of case or this type of defendant.

2. Though not expressly stated anywhere in the complaint, we read UCB's federal cause of action to be based on 42 U.S.C. § 1983.

al guarantee of a certain degree of academic and institutional freedom, but decided that no absolute rule could be devised to measure the violation of that freedom in every case. The court properly confined its First Amendment analysis to the narrow facts of this case, namely, the $217 reimbursment to Montfort. While agreeing with this court that DACO had misinterpreted the "contract" in the Catalogue,[3] the district court nonetheless found no constitutional violation in DACO's actions. It noted that "[t]he agency's misapplication of the standard in the analysis of the contractual relationship cannot be confused with the infringement of the First Amendment rights even when it may give the impression of such infringement." The court concluded that the reimbursement order itself could not be characterized as a "governmental surveillance, control, and regulation over the internal affairs of the UCB" which would constitute a violation of the university's academic freedom. It further decided that UCB's rights were not violated, as the university had asserted, merely by the "concrete intervention of the agency ... [in] ascertaining the breach of an obligation of a university toward its students." The court expressly declined to enjoin DACO from future adjudications involving UCB, rejecting the university's argument that the threat of more extensive intrusions had to be addressed. The district court decided that it need not embark down this postulated slippery slope, noting that it "should not attempt to test the operation of a law under every conceivable set of circumstances," and that it would not analyze hypothetical or conjectural injuries. UCB then filed its second appeal to this court.

### E.

Instead of deciding the constitutional issue on appeal, we determined that the best course of action was to certify the unclear issues of state law for resolution by the Supreme Court of Puerto Rico. We noted our reluctance to subject the statute to constitutional scrutiny without a definitive interpretation of it from that court. The certified questions were as follows:

a. Does the Department of Consumer Affairs (DACO) Organic Act, Apr. 23, 1973, No. 5, 3 L.P.R.A. §§ 341a–341v, apply without qualification or restriction to private, primarily non-sectarian, non-profit colleges and universities in Puerto Rico?

b. If said act does not so apply generally to such colleges and universitites, does it nevertheless apply to the DACO ruling in this case that a student, who because of a campus strike suffered the cancellation of two of his classes, was entitled to a refund of his registration fees of $217, under penalty of fine for noncompliance?

These questions roughly corresponded to the issues presented in what we have been designating UCB's "statutory" claim.

### II. The Response of the Supreme Court of Puerto Rico

Subsequently, several opinions issued from the Supreme Court of Puerto Rico, evidencing considerable thought and discussion. A judgment, declining to answer the certified questions, was joined by four justices. *Cuesnongle v. Ramos*, No. CE–85–468, slip op. (P.R. June 30, 1987). Three of those justices issued a plurality opinion. *Id.* (Hernandez Denton, J., concurring, joined by Ortiz and Alonso, JJ.) (hereinafter "plurality opinion"). The fourth concurring justice, Mr. Justice Negron, did not join in that opinion. Two justices dissented from the majority's judgment, and issued a separate opinion. *Id.* (Rebollo Lopez, J., dissenting, joined by Naveira de Rodon, J.). The Chief Justice filed a separate opinion, concurring in the judgment of the majority declining to answer the first, "general" certified question, but dissenting from the majority as to the second question, which dealt with the application of the statute to the specific adjudication of Montfort's claim. The Chief Justice not only declared that the Court *should* answer the second certified question, but went on to agree

---

**3.** Though the district court did disparage DACO's reading of the "contract," it refused to invalidate the order on this basis. Nor did the court discuss its pendent jurisdiction to entertain the state law causes of action after *Pennhurst. See* discussion *infra* at Section IIB.

with the federal district court that the DACO organic statute was applicable to that particular circumstance, and further opined *ex mero motu* that this application did not constitute a constitutional violation. *Id.* (Pons Nunez, C.J., concurring and dissenting). One of the other two dissenting justices issued yet another dissenting opinion, in which she criticized any particular answers to the certified questions as "at the most, an advisory opinion." *Id.*, separate opinion of Naveira de Rodon, J. at 1.

The analysis of the plurality opinion begins by acknowledging that certification is proper under Puerto Rican law where:

> (1) the controversy involves questions of Puerto Rican law; (2) *said questions may determine the outcome of the case;* (3) there are no clear-cut precedents in our Court's case law; and (4) the case makes an account of all the facts relevant to said questions showing clearly the nature of the controversy giving rise to the questions.

Plurality opinion at 6 (emphasis added)[4] (citing *Pan American Computer Corp. v. Data General Corp.*, 112 P.R. Dec. 780, 788 (1982)). The plurality also went out of its way to identify some of the benefits of the certification process: "[I]t saves time and resources; brings uniformity into statutory interpretation; protects the federal rights of the parties; adequately delimits the issues and harmonizes the relations between the state and federal forums." Plurality opinion at 7.

This reasoning might seem to justify an answer to our certified questions from the Supreme Court of Puerto Rico. After all, if the supreme court were to rule that DACO did not have jurisdiction, over either the university generally or over this particular dispute, then that answer would "determine the outcome of the case" without any further federal inquiry. Thus, all four of the stated prerequisites for certification are met. Nevertheless, the plurality went on to conclude that:

To answer the certified questions we would *necessarily* have to analyze whether this type of state interference violates the local constitutional clauses of freedom of speech and separation of church and state, Constitution of the Commonwealth, Art. II, Secs. 1, 3, 4, and 7. We cannot pass on the scope of [DACO's] jurisdiction in a case that deals with a church-affiliated University, without *necessarily* examining whether the agency's power to pass on complaints violated the constitutional provisions as to freedom of speech and of religion. These guarantees of our Constitution are analogous to those enshrined in the First Amendment. . . .

Plurality opinion at 7 (emphasis added). The plurality then concluded that its decision would be "purely advisory," because "[w]e are dealing with a controversy on the constitutionality of a state law under the Constitution of Puerto Rico, which is similar to a provision of the federal Constitution." *Id.* at 7–8. Quoting *Pan American Computer Corp. v. Data General Corp*, 112 P.R. Dec. 780 (1982), the plurality insisted that the question could be ruled on only by the federal court, "because the validity of the statute under the federal constitution necessarily disposes of the question under the state law." Plurality opinion at 8 (quoting *Pan American*, 112 P.R. Dec. at 794, No. 0–79–184, slip op. at 13 (P.R.1982)).

In order fairly to understand the wellsprings of this reasoning, it is necessary to look back to the *Pan American* case, where the Supreme Court of Puerto Rico began to explicate its practice on certification. At the start of that decision, the supreme court articulated the four-part test for certification that was reiterated by the *Cuesnongle* plurality. The lynchpin of that test, namely, that certification is appropriate where the answers "may determine or are determinant to the case," was derived directly from Rule 27 of the Rules of the Court. *See Pan American*, slip op. at 6–7, 112 P.R. Dec. at 787–88. The su-

---

**4.** All quotations from Puerto Rico cases are taken from the official English translation issued in slip opinion form by the Supreme Court of Puerto Rico. The citations provided refer both to those official slip opinion translations and to the reported opinions in Spanish, as available.

preme court held that for this requirement to be complied with, "it suffices ... that *one* of the possible answers of this Court to the certified question *may* determine the outcome of the case." *Pan American,* slip op. at 8 (emphasis added), 112 P.R. Dec. at 789. This rule would mandate certification in the case before us, because it is clear that the litigation would be at an end if the supreme court were to decide that DACO had no statutory jurisdiction over either the UCB or over this particular dispute.

The *Pan American* court, however, proceeded to carve out an exception to the general rule which they had just articulated. In *Pan American,* the supreme court had been asked to interpret a question of state *constitutional* law which might have rendered superfluous the federal analysis of federal constitutional law in the case. This the supreme court refused to do, because the state constitutional provision in question was identical to the parallel federal constitutional provision in the case. Where that was the case, and if the supreme court decided the state constitutional question in a way that did *not* dispose of the case, then the federal court, when reviewing the federal constitutional question, could "disregard" the state court analysis and "decide the *same* question under federal constitutional standards different from ours, or even using the same standards, it could reach a different re-

sult." Slip op. at 14 (emphasis added), 112 P.R. Dec. at 794. This possibility "would have the impermissible effect of having the federal court review our decision, when the only court that may review a decision of this Court, in appropriate cases, is the U.S. Supreme Court." *Id.* The supreme court concluded that this possibility rendered its decision "advisory," because "the federal court reserves the power to determine the rightness of our decision." Slip op. at 15, 112 P.R. Dec. at 795.

From this reasoning, it follows that where *one* of the possible questions would necessitate analysis reflecting at least an implicit understanding of federal law, then the supreme court will refuse to answer the question so as to avoid any risk that part of its analysis would be reviewed, rejected, or modified by a lower federal court.[5] The particular application of this rule in the *Pan American* context is that where resolution of a state constitutional issue will entail a tacit analysis of parallel federal constitutional law, then the supreme court will decline to subject itself to the possibility that such analysis will be "overturned" by the federal court. Thus, the Supreme Court of Puerto Rico will not answer certified questions regarding the state constitution unless the provision in question has "no counterpart in the federal constitution." Slip op. at 14, 112 P.R.Dec. at 794.[6] There was no discussion in *Pan*

5. One federal court has interpreted this rule to mean that "unless it has the last word on *all* matters presented by a lawsuit, [the Supreme Court of Puerto Rico] will not answer specific or limited questions of Commonwealth constitutional or statutory law presented to it for resolution." *Thompson v. Ramirez,* 597 F.Supp. 730, 732 (D.P.R.1984). We read *Pan American* differently. In our view, the supreme court will refuse to answer a question not when it is denied the last word on deciding *all* matters in a lawsuit, but rather, when it might not have the last word on those matters which it *would* decide were it to answer the question.

6. We think it may be helpful, by way of comment on the supreme court's understandable reluctance to invite "overruling" by inferior federal courts, to make two points. The first is that any case like *Pan American* should never present a problem, because the United States Supreme Court has ruled that abstention should not be used to determine the content of a state

constitutional provision which parallels the federal constitution. *See Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 237 n. 4, 104 S.Ct. 2321, 2327 n. 4, 81 L.Ed.2d 186 (1984); *Wisconsin v. Constantineau,* 400 U.S. 433, 439, 91 S.Ct. 507, 511, 27 L.Ed.2d 515 (1971); *see also Guiney v. Roache,* 833 F.2d 1079 (1st Cir.1987). This rationale extends by analogy to certification. Cases such as *Pan American* should not be certified in the first place.

Our second point is that even if a federal court ultimately grants relief under a federal constitutional guarantee after a state court has engaged in some arguably inconsistent analysis of a parallel state constitutional provision, the federal action is not one of "overruling." State courts are daily required, in cases which come before them in the normal course of litigation, to decide state constitutional questions, despite the fact that a federal court can in a future case "reject" the federal *analysis* previously relied upon by the state court. The state court's decision on the *state* constitutional question is not

*American* concerning the apparent impossibility of reconciling this standard with the rule explicated earlier in the same opinion that certification is proper where *one* of the possible answers *may* be dispositive of the case. We therefore assume that the supreme court is merely identifying an exception to this general rule for cases where constitutional analysis obviously is latent in the certified questions.

In *Cuesnongle,* the plurality opinion extends the *Pan American* "exception." The source of this extension is the plurality's claim that it "cannot pass on the scope of [DACO's statutory] jurisdiction in a case that deals with a ... university, without *necessarily* examining whether the agency's power to pass on complaints violated the [state] constitutional provisions as to freedom of speech...." Plurality opinion at 7 (emphasis added). The plurality then notes that those state constitutional guarantees, the explication of which it views as indispensable to an analysis of the statutory issues, are precisely analogous to those enshrined in the federal First Amendment. The plurality's conclusion drawn from these premises is that an evaluation of the *federal* constitutional issues is a necessary part of the analysis of the state *statutory* questions. And because that implicit analysis of the federal issues might conceivably be "overturned" by this court after certification, the supreme court should refuse to leave itself open to "reversal."

### III. Implications for the Certification Process

We have presented the reasoning of the supreme court's plurality at some length because, in expressing our own concerns, it is important that we have a full and fair understanding of the source of the supreme court's positions.

At the very outset, we acknowledge that the power of the Commonwealth court to answer questions certified to it by a federal court is discretionary, not mandatory. *See*

Rule 27(a) of the Rules of the Supreme Court of Puerto Rico, P.R.Laws Ann. tit. 4, App. I–A, at 422–23 (1978) (Court *"may* take cognizance" of certified matters); *Pan American,* slip op. at 7–8, 112 P.R. Dec. at 788. We respect the supreme court's right to respond or not, as it pleases.

One invaluable attribute of the certification process, however, is that it presents the rare occasion when courts of different systems can talk to one another about common problems. It is in this spirit of continuing institutional and collegial dialogue that we reflect upon, and express our concerns about, the future usefulness of certification in helping both courts to serve our respective missions in a cooperative and mutually beneficial manner.

What concerns us most is the sweep of the implication which flows from the plurality's assumption that questions such as whether students are "consumers" under DACO's organic act and whether university course offerings are the sort of "services" the Act is meant to regulate cannot be disposed of without to resort to state constitutional analysis. The implication is that there is very little room for any such creature as "strict" statutory construction, unencumbered by constitutional analysis.

The plurality's assumption is, apparently, that as legislators would never "intend" for a statute to be unconstitutional or to be applied in an unconstitutional manner, constitutional considerations are a necessary element in divining the always-elusive "legislative intent." Under this view, it would be impossible (or seldom possible) to determine "in the abstract" whether a law "applies" to a particular situation, wholly independent of constitutional concerns.

We find this notion difficult to grasp, in light of the fact that courts make it their daily business to isolate and segregate statutory and constitutional issues from one another in the analysis of a case. It is, after all, received wisdom that statutory issues should always be resolved "before"

overruled; it remains the authoritative word on the state constitution. The state court is then free to reject, accept, or extend the reasoning of

the federal court when related state constitutional questions arise in the future.

constitutional ones, precisely so as to avoid unnecessary consideration of constitutional controversies.

We do concede that there is something to be said for the plurality's view, at least as a theoretical construct. In *Government and Civic Employees Organizing Comm., CIO v. Windsor*, 353 U.S. 364, 77 S.Ct. 838, 1 L.Ed.2d 894 (1957), the Supreme Court recognized that where a federal court abstains from deciding a constitutional challenge to a state statute in order to obtain an authoritative interpretation of that statute from the state court, the state court might analyze the statute in a different manner if asked to do so "in light of" the plaintiff's constitutional objections. *Id.* at 366, 77 S.Ct. at 839. And in *England v. Louisiana State Board of Medical Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed. 2d 440 (1964), the Court explained this process in more detail. Where the federal court invokes *Pullman* abstention, *see Railroad Comm'n v. Pullman*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), a plaintiff may reserve the federal claims for federal litigation. Nonetheless, the plaintiff is obligated to bring those federal claims to the attention of the state court for resolution of the *state* claims. 375 U.S. at 420, 84 S.Ct. at 467. This procedure allows the state court to address the state claims with a full understanding of the constitutional context. It does, however, have certain ramifications:

> [T]he parties cannot prevent the state court from rendering a decision on the federal question if it chooses to do so; *and even if such a decision is not explicit, a holding that the statute is applicable may arguably imply, in view of the constitutional objections to such a construction, that the court considers the constitutional challenge to be without merit.*

*England*, 375 U.S. at 421, 84 S.Ct. at 467 (emphasis added).

This is, however, precisely the situation that the plurality finds unacceptable in the case where the federal and state constitutions are parallel, for it allows the federal court subsequently to reject the state court's explicit or implicit reading of federal law, and thus, the plurality insists, threatens to render unnecessary (and therefore "advisory") the state court's reading of its own constitution. *But see* note 6, *supra.*

It may be that there are federal constitutional considerations that are relevant to some degree to many, if not all, questions of state statutory interpretation. Nevertheless, if the Supreme Court of Puerto Rico does in fact refuse to answer certified questions on this basis, then the certification process in Puerto Rico will be eviscerated in those cases where a federal constitutional question *might* remain even after the resolution of the state law issues. This logic would also preclude *Pullman* abstention in Puerto Rico whenever a federal constitutional issue is reserved by the plaintiff for federal consideration.

Thus, the position of the plurality threatens to devitalize abstention and certification doctrines in all constitutional cases.[7] This result would invariably detract from the benefits of comity and harmony promoted by those long-standing practices. As the Supreme Court of Puerto Rico itself has noted, "[t]he tensions inherent in the federalist system are largely relieved" through certification. *Pan American*, slip op. at 4, 112 P.R.Dec. at 785. We cannot improve on its language:

> The main objectives of the abstention doctrine applicable herein are to prevent

---

**7.** The actual rule articulated in *Pan American* and by the *Cuesnongle* plurality is that questions will be left unanswered in such cases only where the state and federal constitutions are for such purposes congruent. *Pan American*, slip op. at 14, 112 P.R.Dec. at 794; *Cuesnongle* plurality opinion at 8. Presumably, then, the supreme court would respond to certified questions when the two constitutions diverged, even though their state statutory or constitutional analysis would necessarily be "in light of" federal constitutional concerns. If this is the case, it would indicate that the vice the supreme court wishes to avoid is not so much being second-guessed *per se,* but rather, being second-guessed on *state* law—which occurs, according to that court's understanding, whenever the state law happens to entail federal analysis. *See supra,* at 1491–92.

the federal court from ruling on federal constitutional questions if the case can be decided by a state question, and to defer to state courts the decision of said questions under state law. Thus harmony and respect between the courts of one and the other jurisdiction is promoted. This goes to the marrow of the federalist system.

*Id.*, slip op. at 13, 112 P.R.Dec. at 793. Indeed, abstention and certification are especially beneficial in cases involving Puerto Rico law, because, as the United States Supreme Court has noted, "[a] rigid rule of deference to interpretations of Puerto Rico law *by Puerto Rico courts* is particularly appropriate given the unique cultural and legal history of Puerto Rico." *Posadas de Puerto Rico Assoc. v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 106 S.Ct. 2968, 2976 n. 6, 92 L.Ed.2d 266 (1986) (emphasis added). *See also Fornaris v. Ridge Tool Co.*, 400 U.S. 41, 44, 91 S.Ct. 156, 158, 27 L.Ed.2d 174 (1970).

We would hope that the distinction between strict statutory construction and constitutional analysis can be maintained so that as wide a field as possible may be kept open for the certification of questions of unclear Puerto Rico statutory law. Such a posture would preserve the system of abstention envisioned by the United States Supreme Court in *Pullman* and *England.* The Supreme Court has, after all, recognized that state courts might not be able to avoid implicit constitutional analysis in their answers to state law questions, but nevertheless continues wholeheartedly to endorse abstention and certification. *England*, 375 U.S. at 421 & n. 12, 84 S.Ct. at 468 & n. 12.

### IV. The Restraints of *Pennhurst*

In the meantime, we are left in this case with a constitutional issue concerning the cherished right of academic freedom. This issue would normally be avoided here, where it seems that the case might be resolved on state statutory grounds. But that, as we have seen, is not a viable option here. So we enter a new thicket.

### A.

■ We must determine at the outset what to do about the remaining state law issues. We begin with one of the most firmly established and respected doctrines in our jurisprudence, namely, that federal constitutional issues should be avoided where other grounds of decision are available. The most famous of the numerous formulations of this rule is that proffered by Justice Brandeis:

> The Court [has] developed, for its own governance in the cases confessedly within its jurisdiction, a series of rules under which it has avoided passing upon a large part of all the constitutional questions pressed upon it for decision.
>
> . . . .
>
> The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of. This rule has found most varied application. Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter. *Siler v. Louisville & Nashville R. Co.*, 213 U.S. 175, 191 [29 S.Ct. 451, 454, 53 L.Ed. 753].

*Ashwander v. TVA*, 297 U.S. 288, 346–47, 56 S.Ct. 466, 482–83, 80 L.Ed. 688 (1936) (concurring opinion). This principle has been assiduously followed by the federal courts. *See, e.g., Mills v. Rogers*, 457 U.S. 291, 305, 102 S.Ct. 2442, 2451, 73 L.Ed.2d 16 (1982); *Hagans v. Lavine*, 415 U.S. 528, 546–47, 94 S.Ct. 1372, 1383–84, 39 L.Ed.2d 577 (1974); *In re Justices of the Supreme Court of Puerto Rico*, 695 F.2d 17, 22 (1st Cir.1982). Thus, when the constitutionality of a statute is in question, the statute should first be construed, "if such a construction is fairly possible, to avoid raising doubts of its constitutionality." *St. Martin Evangelical Lutheran Church v. South Dakota*, 451 U.S. 772, 780, 101 S.Ct. 2142, 2147, 68 L.Ed.2d 612 (1981).

■ A natural corollary of this principle is that "unsettled questions of state law must be resolved before a substantial fed-

eral constitutional question can be decided." *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 236, 104 S.Ct. 2321, 2327, 81 L.Ed.2d 186 (1984). If a state statute might be construed so as to moot or alter materially the constitutional questions, then the state law question should be resolved first. This is the lesson established in the very case cited by Justice Brandeis. *See Siler v. Louisville & Nashville Railroad Co.,* 213 U.S. 175, 193, 29 S.Ct. 451, 455, 53 L.Ed. 753 (1909). *See also Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 160–63 & nn. 44–46, 104 S.Ct. 900, 940–41 & nn. 44–46, 79 L.Ed.2d 67 (Stevens, J., dissenting) (collecting cases applying *Siler* rule).

*Railroad Comm'n v. Pullman,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), established that when a constitutional question is premised on an unsettled question of state law, the federal court should postpone adjudication of the case while a separate action is adjudicated in state court, thus providing the state courts the opportunity to settle the underlying state law issues. Certification of the state questions to the highest tribunal in the state is an alternative method of honoring these same concerns. *Pullman* abstention and certification can be seen, therefore, as procedural schemes instituted to foster the principles embodied in the *Ashwander* rule when the state law issues are unclear. The *Pullman* court noted that where a federal court "is asked to decide an issue by making a tentative answer which may be displaced tomorrow by a state adjudication," so that an "unnecessary ruling of a federal court is ... supplanted by a controlling decision of a state court," then the court should adopt a strategy "that will avoid the waste of a tentative decision as well as the friction of a premature constitutional adjudication." *Pullman,* 312 U.S. at 500. Abstention serves the policy of avoiding unnecessary constitutional questions, and the related policy of avoiding adjudication of abstract, hypothetical issues. *Government and Civic Employees Organizing Comm. v. Windsor,* 353 U.S. 364, 366, 77 S.Ct. 838, 839, 1 L.Ed.2d 894 (1957). Most important, by allowing the states to resolve their own

contested issues of state law, abstention evinces a " 'scrupulous regard for the rightful independence of the state governments.' " *Pullman,* 312 U.S. at 501, 61 S.Ct. at 645 (quoting *Di Giovanni v. Camden Ins. Ass'n,* 296 U.S. 64, 73, 56 S.Ct. 1, 5, 80 L.Ed. 47 (1935)). It is well established, then, that "[a]mong the cases that call most insistently for abstention are those in which the federal constitutional challenge turns on a state statute, the meaning of which is unclear under state law." *Harris County Comm'rs Court v. Moore,* 420 U.S. 77, 84, 95 S.Ct. 870, 875, 43 L.Ed.2d 32 (1975).

### B.

Until recently, the *Siler* principle would leave us two options for proceeding with a case such as the present one. We could either attempt to resolve the state law issues ourselves, or, where those questions are unclear, we could invoke *Pullman* abstention, thus sending the case to the state court system for resolution of the posssibly dispositive state law issues. The latter option is still available to us, but, as we explain below, *infra* section IVD, it is not advisable where, as here, the supreme court of the state has already evidenced its disinclination to consider the matter. The present posture of the case would seem, then, to point to the former option—our own resolution of the state law questions. Yet this alternative, too, is unavailable here, because we would have no power to enforce a judgment against DACO on the basis of state law.

In *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), the Supreme Court decided that sovereign immunity prohibits federal courts from ordering state officials to conform their conduct to state law. In *Pennhurst,* the Supreme Court had initially directed the lower courts to consider whether the respondents were entitled to relief under state law. *Pennhurst State School & Hospital v. Halderman,* 451 U.S. 1, 31, 101 S.Ct. 1531, 1547, 67 L.Ed.2d 694 (1981). The lower courts dutifully followed *Ashwander,* and ruled for the plaintiffs on

the basis of state law without addressing the federal questions. The Supreme Court then ruled that pendent jurisdiction over state claims was barred by the Eleventh Amendment where the relief sought is an injunction against state officials. The Court remanded again to the court of appeals for consideration of plaintiffs' claims under federal law, even though that court had already determined that relief under state law could preclude unnecessary constitutional analysis. As Justice Stevens pointed out in dissent, this disposition had the effect of overruling the entire history of *Siler/Ashwander* doctrine in cases where injunctive relief is requested against the state. 465 U.S. at 159–63, 104 S.Ct. at 939–41 (Stevens, J., dissenting). The majority acknowledged that this might well be a necessary consequence of the decision, *id.* at 122, 104 S.Ct. at 919, but reasoned that considerations of "policy," such as the *Siler* doctrine, "cannot override the constitutional limitation on the authority of the federal judiciary to adjudicate suits against a State." *Id.* at 123, 104 S.Ct. at 920.

■ There are two options for a post-*Pennhurst* plaintiff who wishes to bring a claim for injunctive relief against state officials under alternative federal and state theories: either to litigate both federal and state claims in state court, or to bifurcate the litigation so that the state claims are heard in state court and the federal claims are heard in federal court.

If the plaintiff wishes the federal court to address the federal claims, bifurcation will be the only option.[8] In that circumstance, the federal cause of action will be grounded exclusively on federal law, even where state law causes of action might be dispositive. The federal court cannot, after *Pennhurst*, resolve the case on the basis of those state law questions. Therefore, in those cases where it cannot use *Pullman* abstention, the court must reach the federal constitutional questions, in violation of the *Siler* principle.

This conclusion brings us back to the instant case, which we now must treat as if it were brought exclusively under federal law. Despite the jurisdictional bar to our adjudication of UCB's state law claims, we still have two sorts of state issues in the case, the resolution of either one of which might moot the federal questions. First, we have the statutory question of DACO's jurisdiction, which the Supreme Court of Puerto Rico has declined to answer on certification. Because of *Pennhurst*, we could not grant relief on the basis of a finding that the statute did not authorize DACO with jurisdiction over the university. Nor, for reasons expressed below, do we think *Pullman* abstention appropriate to decide this statutory question. The second unresolved issue of state law is whether

8. Because of another decision issued the same day as *Pennhurst,* a plaintiff might even decline to litigate the state law issues in state court until the federal litigation is completed. In *Migra v. Warren City School Dist. Bd. of Educ.,* 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984), the Court held that state court judgments must be given the same claim preclusive effect in federal court that they would be accorded in state court, even where the federal plaintiff raises a claim under 42 U.S.C. § 1983. Thus, where a plaintiff neglects to raise a federal claim in a state court action, that plaintiff is estopped from raising the federal claim in federal court subsequent to a state court judgment.

If the claims are bifurcated, it is also possible that the plaintiff will be denied "the benefit of a federal trial court's role in constructing a record and making fact findings," *England v. Louisiana State Bd. of Medical Examiners,* 375 U.S. 411, 416, 84 S.Ct. 461, 465, 11 L.Ed.2d 440 (1964), because a prior state court factfinding may have issue preclusive effect on the subsequent state

proceeding, even in actions under § 1983. *See Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980).

Bifurcation of claims pursuant to *Pennhurst* thus threatens to foreclose federal court jurisdiction over the federal claims because of the res judicata effect of a possible state court judgment entered during the pendency of the federal litigation. This unfortunate dilemma is not merely a speculative, academic hypothetical. *See Beaver v. Bridwell,* 598 F.Supp. 90, 93 (D.Md.1984).

The scylla and charybdis of *Pennhurst* and *Migra* therefore leave the plaintiff who seeks relief under both state and federal law with only one (less than optimal) course of action, namely, litigating the federal claims in federal court, and *then,* if unsuccessful, bringing the state claims in state court, provided that state court litigation at such a late date is not barred by the statute of limitations. This is the result envisioned in *Migra.* 465 U.S. at 84–85 & n. 7, 104 S.Ct. at 897–98 & n. 7.

DACO properly construed the "contract" in the UCB Catalogue to provide Montfort with an actionable claim of breach. This question is not "unclear"; it could be answered through a simple process of contract interpretation. Answering this question might have the additional virtue of avoiding both the constitutional issues and the state law questions as to DACO's jurisdiction. Both this court and the district court have already expressed serious reservations as to whether DACO properly interpreted the "contract." Yet we cannot decide the case on this apparently straightforward ground, either, because *Pennhurst* precludes us from enforcing the judgment.[9]

### C.

Before we address whether *Pullman* abstention should be invoked as to the state statutory question of DACO's jurisdiction, it is instructive to examine whether abstention could also be used to resolve the action on the state "contract" ground. Normally, abstention would be inappropriate for that sort of issue, because the state law is not unclear. But what about the situation in which we now find ourselves, where the federal court has no power to enforce a judgment based on clear and dispositive state law grounds?

An ironic consequence emerges from the confluence of *Pennhurst* and *Pullman*. Because of the traditional preconditions to *Pullman* abstention, a court will often be in the interesting posture of being able to follow the *Siler* principle only where the state law *might* be dispositive, but not where it clearly *is* dispositive.

If the state issues are *not* clear, the federal court can abstain, and allow the state courts to resolve those issues. If the case is not settled by the state court action,

the plaintiff would still have the opportunity to fully litigate the facts and law of the case in federal court, as long as the plaintiff properly had executed an *England* reservation. If, on the other hand, the state law issues *are* clearly dispositive, and would necessitate injunctive relief against state officials, the federal court is obligated by *Pennhurst* to proceed to the federal issues, despite the teachings of *Siler* and *Ashwander.*

In response to this anomaly, it has been suggested, albeit implicitly, that a new variant of *Pullman* abstention be established. In this newfangled version of abstention, it would be unnecessary that the state law issues be unclear. It would suffice that those issues might be dispositive but could not be acted on by the federal court. In other words, the *Pennhurst* doctrine of sovereign immunity would itself trigger *Pullman*-type abstention where the court wishes to avoid the constitutional questions. *See Allendale Leasing, Inc. v. Stone,* 614 F.Supp. 1440, 1452 (D.R.I.1985), *aff'd,* 788 F.2d 830 (1st Cir.1986); *see also Kollsman v. City of Los Angeles,* 737 F.2d 830, 836-37 n. 18 (9th Cir.1984) (suggesting in dictum that *Pennhurst* might be alternative ground for *Pullman* abstention). This practice would honor the rule that federal questions not be decided where non-federal issues are dispositive.

Most courts, however, seem to have refrained from abstention where the prerequisite of state law unclarity is not present, even though this means resolving the federal questions "prematurely." *See, e.g., Society for Good Will to Retarded Children v. Cuomo,* 652 F.Supp. 515, 518, 522-23, 526 (E.D.N.Y.1987) ("[W]hile abstention has substantial benefits in meeting

---

9. We presume that *Pennhurst* would bar the federal court from issuing the injunction prayed for in this case. It has been suggested, however, that *Pennhurst* sovereign immunity doctrine possibly extends only to the sort of injunctive relief sought in *Pennhurst, i.e.,* far-reaching, "affirmative" relief that requires state officials to conform to a detailed regulatory system as prescribed by state law. Where the relief requested is less systemic and intrusive, perhaps the Eleventh Amendment does not prohibit federal enforcement of state law. *See* Shapiro, *Comment —Wrong Turns: The Eleventh Amendment and the* Pennhurst *Case,* 98 Harv.L.Rev. 61, 83 & n. 127 (1984). This view may well be correct; perhaps the sort of "prohibitive" injunction sought here does not rise to the level of interference that triggers sovereign immunity. But this is not the case in which to evaluate this distinction. We assume, without deciding, that the Eleventh Amendment bars the relief requested by UCB in its federal complaint.

the dilemmas posed by *Pennhurst,* the dangers of this approach may be too great."), *rev'd on other grounds,* 832 F.2d 245 (2d Cir.1987); *Braintree Baptist Temple v. Holbrook Public Schools,* 616 F.Supp. 81, 87 (D.Mass.1984); *see also Rogers v. Okin,* 738 F.2d 1, 5 (1st Cir.1984) (where certification had "yielded an unambiguous elucidation of relevant state law," *Pullman* abstention factors not satisfied; where case had already been prolonged, permissible for federal court to resume adjudication of federal issues). There is a danger that a further extension of the abstention doctrine would augur an erosion of the principle announced in *Monroe v. Pape,* 365 U.S. 167, 183, 81 S.Ct. 473, 481–82, 5 L.Ed.2d 492 (1961), that because federal remedies under § 1983 are supplemental to state remedies, plaintiffs need not exhaust state procedures prior to initiating a § 1983 action in federal court. Abstention is, of course, a slight exception to this general rule,[10] but it should be remembered that it is

> an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest.

*County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 188–89, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959). The Supreme Court has taken care to admonish that "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule." *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976).

Because we decide on alternative grounds that abstention is inappropriate in this case even where it is permissible, we decline to decide whether *Pullman* abstention can be invoked when the state questions are clear and dispositive but where the federal court is powerless to enforce

the state law. We merely note that this is a dilemma that cannot be avoided for long, given the competing demands of *Pennhurst, Siler,* and *Pullman.*

### D.

Because the Supreme Court of Puerto Rico declined to answer the state law questions, we could invoke *Pullman* abstention, sending the case to the state trial court for resolution of the questions we had earlier certified. In addition, the state courts could determine whether, under the civil law contract doctrine of the Commonwealth, DACO properly interpreted the university Catalogue, which was found to be the "contract" between the parties.

■ Nevertheless, we decline to order the district court to abstain. We do so for two principal reasons. First, we heed the Supreme Court's warning that "because of the delays inherent in the abstention process and the danger that valuable federal rights might be lost in the absence of expeditious adjudication in the federal court, abstention must be invoked only in 'special circumstances.'" *Harris County Comm'rs Court v. Moore,* 420 U.S. 77, 83, 95 S.Ct. 870, 875, 43 L.Ed.2d 32 (1975) (quoting *Zwickler v. Koota,* 389 U.S. 241, 248, 88 S.Ct. 391, 395, 19 L.Ed.2d 444, (1967)). *See also Rogers v. Okin,* 738 F.2d 1, 5 (1st Cir.1984) (abstention inappropriate after ten years of litigation); *Druker v. Sullivan,* 458 F.2d 1272, 1274 (1st Cir. 1972). It is too late in the day to ensure that this adjudication be expeditious, but that is hardly a reason to prolong it further still. This $217 controversy is now almost seven years old; it has been in the federal courts since 1981. It has been the source of much confusion and stasis. Our decision not to abstain is, thus, in part "a concession to the shortness of life." *Reeve v. Dennett,* 145 Mass. 23, 28, 11 N.E. 938 (1887) (Holmes, J.).

More significantly, the highest court in the Commonwealth has already indicated in

---

**10.** But even under *Pullman* abstention, the federal plaintiff still has recourse to the federal forum for adjudication of his or her federal

claims if the case is not resolved in state court. *England,* 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964).

no uncertain terms that it wishes to avoid the "state" issues, which, according to the plurality, cannot be resolved separate from the federal claims. While we have noted problems with the plurality's position on this practice, we respect the supreme court's right to decline to answer certified questions. We presume that the Puerto Rico judiciary would be equally unreceptive to the state law questions if they were presented in the form of a separate state court proceeding while the federal court abstains. It is possible that the Commonwealth judiciary would decline jurisdiction over the abstained case because of what it perceives as the "advisory" nature of the proceedings.[11] In the alternative, if it was required by its rules of procedure to adjudicate the state case, it would do so reluctantly, knowing that the federal court still had a final say over the underlying federal questions. In any event, whether or not the Commonwealth courts adjudicated the state claims, it could be years before the case is finally resolved in the courts of Puerto Rico or the United States.

The United States Supreme Court anticipated that this standstill might come to pass. In *England,* Justice Brennan, writing for the Court, warned that "if the state court has declined to decide the state question because of the litigant's refusal to submit without reservation the federal question as well, the [federal] District Court will have no alternative but to vacate its order of abstention." 375 U.S. at 422 n. 12, 84 S.Ct. at 468 n. 12. Therefore, we decline to abstain in the first instance, since the certification process has already made us aware of the Puerto Rico judiciary's refusal to consider only the state questions. We shall now turn to the First Amendment questions raised by UCB, even though it is likely that these novel constitutional issues could have been avoided if the state law questions had been addressed. With great reluctance, we necessarily violate the *Siler/Ashwander* principle.[12]

11. This posture would be similar to that adopted by the Texas judiciary. The Texas Supreme Court adopted a rule that it cannot grant declaratory relief under state law if a federal court retains jurisdiction over the federal claim. *United Services Life Ins. Co. v. Delaney,* 396 S.W.2d 855 (Tex.1965). In response, the federal courts have altered their abstention procedure in Texas cases such that the federal case is dismissed without prejudice, rather than merely stayed. *See, e.g., Harris County Comm'rs Court v. Moore,* 420 U.S. 77, 88–89 n. 14, 95 S.Ct. 870, 877–78 n. 14, 43 L.Ed.2d 32 (1975); *Nissan Motor Corp. v. Harding,* 739 F.2d 1005, 1011–12 (5th Cir.1984); *Palmer v. Jackson,* 617 F.2d 424, 431 n. 11 (5th Cir.1980); *Barrett v. Atlantic Richfield Co.,* 444 F.2d 38, 45–46 (5th Cir.1971). We are doubtful that such a technicality of procedure would affect the Supreme Court of Puerto Rico one way or another. Their complaint is not that they are asked to answer questions while another court has jurisdiction over the matter; it is that their analysis of state law issues which parallel federal questions could be second-guessed by the federal courts. This concern is not allayed by the mere palliative of dismissing without prejudice, since the plaintiff can still re-enter federal court for adjudication of the federal questions if the state proceeding is unavailing. Thus we decline to invoke the "Texas exception."

12. We take this opportunity to explain why the certification procedure invoked here was not itself barred by *Pennhurst.* If the Supreme Court of Puerto Rico had concluded that DACO had no jurisdiction, over either UCB generally or this case in particular, it is true that no federal court would have been able to enforce that decision against DACO officials, because of the Eleventh Amendment. This fact does not, however, render the certification process superfluous or unwise, because such certification might still serve the purpose of precluding resort to adjudication of the federal claims.

In *Rogers v. Okin,* this court upheld an injunction against state officials in a suit under § 1983. 634 F.2d 650 (1st Cir.1980). The Supreme Court remanded with instructions to dispose of the case on state law grounds. *Mills v. Rogers,* 457 U.S. 291, 306, 102 S.Ct. 2442, 2452, 73 L.Ed.2d 16 (1982). Shortly thereafter, the Court decided in *Pennhurst* that we were forbidden from doing just that. In the meantime, however, the Massachusetts Supreme Judicial Court had answered our certified questions in such a way that the federal questions were for all intents and purposes displaced by state law. We acknowledged that these answers did not technically moot the federal case, because there was no assurance that the decision of the SJC would be enforced without a judicial judgment. 738 F.2d 1, 4 (1984). Nevertheless, we ordered the district court to terminate the injunction against the state officials, on the presumption that state officials would comply with the standards announced by the state's highest court. *Id.* at 9. Though it was possible to go on to determine the federal standards, prolonging the already protracted litigation made little sense "given the state court's unequivocal commitment to standards which are as high or higher."

## V. The Academic Freedom Claim.

Our first task in the constitutional analysis is to assess the injury that UCB is alleged to have suffered. While the university does contend that the reimbursement to Montfort itself violates a First Amendment right, it has taken great pains to assert that this injury is trivial compared to the greater harm it has suffered. UCB contends that the constitutional violation consists of DACO's very adjudication of the contract claims which were presented. UCB's requested relief consists of enjoining the agency from "interfering, meddling, encroaching or entangling with or in the internal affairs and educational process and mission of [UCB]."

It is eminently clear from appellants' briefs that the interference complained of consists not of the "final result" of DACO's resolutions, "but rather the whole process of entertaining, reviewing, and adjudging each claim." Appellants' Brief at 23 n. 2. But we fail to see the basis for appellants' claim that this adjudication *ipso facto* constitutes a violation of First Amendment rights to academic freedom regardless of DACO's resolution of the claims.

The heart of UCB's constitutional argument is that *any* administrative adjudication of claims of this nature against the university is an abridgement of academic freedom. UCB makes its claim very explicit: "[T]he Executive does not have power, authority or jurisdiction to review *any* matter concerning private Academia." *Id.* at 42–43 (emphasis in original).[13] This argument is completely unsupported by law. The university is properly subject to numerous administrative regulatory schemes which do not implicate First Amendment concerns. Some of the most obvious examples include intervention of the Treasury Department in affairs of income, taxation and property, and regulation by the Department of Labor of employee matters.

UCB offers scant explanation of how DACO adjudication *per se* might infringe upon academic freedom. It argues that such regulatory action compels the university to disclose testimony and documentation concerning the disputed claims. Appellants' Brief at 25. UCB complains that it is "forced to defend its actions at a quasi-judicial hearing," *id.* at 32, and that it has "an obligation to disclose to DACO the rationale and thought process behind its academic policies." *Id.* at 33.

Citing *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), and *Surinach v. Pesquera de Busquets,* 604 F.2d 73 (1st Cir.1979), UCB argues that such obligations of disclosure threaten an excessive "entanglement" in academic affairs.

---

*Id.* Of course, the plaintiffs remained free to seek federal relief if the state court declaration proved ineffective in vindicating their rights. *Id.* Certification thus worked in spite of *Pennhurst.* Indeed, in a procedurally similar case in which the only "relief" obtained was the state's voluntary compliance with the state court's answers to certified questions, we noted that *"Pennhurst* encourages by implication the very certification procedure the district court employed here." *Exeter–West Greenwich Regional School Dist. v. Pontarelli,* 788 F.2d 47, 51 (1st Cir.1986).

We presume that had the highest court in the Commonwealth ruled that DACO lacked jurisdiction over claims involving UCB, the agency would have respected this decision despite the lack of an actual injunction to do so. Indeed, we cannot envisage DACO ignoring the pronouncement of the supreme court by attempting to obtain the assistance of Puerto Rico's judiciary in enforcing its order to UCB to reimburse the tuition. In a very real sense, the opinion of the Supreme Court of Puerto Rico would be binding on the parties.

**13.** In our earlier opinion, we suggested that adjudication by DACO over contract claims might be impermissible because of an absence of safeguards in DACO's procedures for the protection of First Amendment concerns that might arise in the claim review. We raised, without adopting, the idea that prophylactic measures might need to be taken to prevent against the *potential* for constitutional infirmities in certain procedures undertaken by an agency that is not "specialized" and "particularly qualified." 713 F.2d at 886. The university, however, rejects even this expansive theory of constitutional injury. "The freedom to teach without inhibition may be jeopardized just as gravely by a restriction and review by a specialized regulatory agency entrusted with the task of directing and supervising private education [as] by a consumer oriented government agency." Appellants' Brief at 44.

Those cases do not support appellants' contentions. In *NAACP* and *Buckley*, the government required organizations to disclose lists of members or contributors. The Court ruled that such disclosure, unless outweighed by a compelling government interest, cannot withstand First Amendment scrutiny. But the court made clear that the First Amendment interest involved in both those cases was the privacy of association and belief. 357 U.S. at 460–66, 78 S.Ct. at 1170–74; 424 U.S. 64–66, 96 S.Ct. at 656–57. UCB has presented no evidence to demonstrate that DACO adjudication of contract claims would implicate these interests. We are unpersuaded that any comparable interest exists that would forbid disclosure of information regarding class schedules, faculty composition, and enrollment fees. In any event, DACO has not *compelled* UCB to disclose anything, thus further distinguishing this case from *NAACP* and *Buckley*, where the state demanded production of documents.

In *Surinach*, DACO itself had subpoened financial data from religious institutions. We ruled there that such disclosure of "extremely detailed information about the expenditure of funds of these Catholic schools," 604 F.2d at 78, had the potential for substantially infringing the schools' free exercise rights, because it constituted an impermissible entanglement under the teachings of *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), and *Walz v. Tax Commission*, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). 604 F.2d at 78–79. The instant case does not involve the "entanglement" element of free *exercise* doctrine; it involves a purported right of academic freedom. We decline to construct a new "entanglement" rule in addition to that used in freedom of religion cases. Such a rule might virtually preclude any state regulation of private universities.

■ We find, therefore, that adjudication over the contract claims without more is insufficient to establish a First Amendment claim against the agency. We prefer to evaluate each claim on a case-by-case basis. If a university is able to show that any particular decision, order, or compelled procedure of the agency impermissibly intrudes upon the academic freedom protected by the First Amendment, it may be afforded relief in federal court. It may be, as we suggested in our prior opinion, that because of its lack of expertise in the area DACO might be insufficiently zealous in protecting the First Amendment interests that will invariably arise incident to its adjudication of university matters. If such is the case, the university will have recourse to either the federal or state judiciary for vindication of its rights of academic freedom. In this particular case, however, we agree with the district court that the specific action taken by DACO here does not constitute an abridgement of those rights. UCB was not compelled to disclose any matters which would harm associational or speech rights, and the reimbursement of $217 itself threatens no protected interest of the appellants.

## VI. Conclusion

Our disposition here is ironic. Appellant may well be correct that DACO misread the University Catalogue to guarantee tuition reimbursement when classes are cancelled. UCB may also be correct that DACO's organic statute does not provide that agency jurisdiction over university matters. Yet after six years of litigation, UCB's federal claims have been finally rejected. We regret that we have had to reach this point in a case where a simple contract interpretation might have resolved the controversy.

It may be that the university can still appeal DACO's decision in the Montfort case to the state courts for resolution of the state law claims.[14] But if that option is foreclosed by the statute of limitations, UCB is without relief in a case where there exists a serious dispute over the agency's substantive decision. Such is the legacy of

---

14. Appellants filed their motion to DACO for reconsideration on November 5, 1981. Pursuant to P.R.Laws Ann. tit. 3, § 341*o*, the Secretary has thirty days to decide on the reconsideration requested. If the Secretary does not re-

spond within thirty days, "it shall be understood that the reconsideration requested has been rejected." *Id.* The record does not reveal that the Secretary ever answered the motion here. The party adversely affected by the reconsideration

*Pennhurst,* in light of the decision of the Supreme Court of Puerto Rico.

*The judgment of the district court is affirmed. Each party to bear its own costs.*

CAMPBELL, Chief Judge (concurring).

I concur in the result reached by the court in part V of the majority opinion, to wit, that appellant did not establish a First Amendment claim against DACO. I join in the reasoning of parts II and III to the extent the court emphasizes its concern in keeping the interjurisdictional certification procedure as widely available as possible. However, I am more cheerful than my colleagues that the Supreme Court of Puerto Rico's opinion does not presage a significant narrowing of the certification device. Respecting part IV, I agree with the specific analysis but am not inclined to view this case as having suffered grievously as a result of *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

I.

As Judge Coffin fully recognizes in his opinion for the court, the decision whether to answer certified questions is completely within the discretion of the Supreme Court of Puerto Rico. Rule 27(a) of the Rules of the Supreme Court of Puerto Rico, P.R. Laws Ann. tit. 4, App. I–A; *Pan American Computer Corp. v. Data General,* 112 P.R.R. 987, 993 (1982) (official translation). *See* Uniform Certification of Question of Law Act, 12 U.L.A. § 1 (1975). A corollary to this is that the Supreme Court of Puerto Rico's treatment of Commonwealth law for the purpose of deciding whether to answer a certified question is within its exclusive domain, and for that reason, I should hesitate to comment at all. But perhaps I can be forgiven the following comments:

Although I share my colleagues' concern that the plurality's reasoning, pushed to its extreme, could strangle the benefits of certification, I remain hopeful that this will not be a necessary result of the Puerto Rico Supreme Court's determination in this case.

First, the Supreme Court of Puerto Rico did not, as a court, adopt any single rationale on the subject at hand. The judgment declining to answer the certified questions was joined by four justices. However, of those four justices, only three agreed on a common rationale for declining to answer. We have no indication as to the fourth justice's reason for joining the judgment. Two other justices dissented from the majority's judgment. The Chief Justice filed a separate opinion concurring in part and dissenting in part. These several opinions evidence considerable thought and discussion among the members of that court. It is evident that the plurality was not able to persuade the majority of the court to join it in its rationale. This fact by itself should limit the effects of the plurality's reasoning.

Second, the peculiar facts of this case suggest a separate, albeit unstated, reason for the Puerto Rico Court's declining to answer—namely, that where, as here, a federal court lacks the authority, under *Pennhurst,* to grant meaningful relief on the separate state cause, the state court may believe that any response would be tantamount to a forbidden "advisory opin-

decision then has fifteen days to file a notice of appeal in the Commonwealth Superior Court. *Id.,* § 341p. When UCB filed its federal complaint on December 9, 1981, only four days of this fifteen-day span had expired. Presumably, then, UCB still has eleven days in which to file its state court appeal, in the event that the federal litigation tolled the statute of limitations.

P.R.Laws Ann. tit. 31, § 5303 states that "[p]rescription of actions is interrupted by their institution before the courts." We have held that "to toll the statute, the action [instituted] in the courts must be the case at bar, and not merely a somewhat related action arising from the same facts." *Ramirez de Arellano v. Alvarez de Choudens,* 575 F.2d 315, 320 (1st Cir.1978). In an action against DACO, we later held that where the two actions seek different forms of relief, the actions are not the "same" for purposes of tolling. *Altair Corp. v. Pesquera de Busquets,* 769 F.2d 30, 32 (1st Cir.1985). We do not decide here whether UCB's possible state law action would be the "same" as the present one. We simply note that, unlike in *Altair,* plaintiff here did not seek damages in the federal action. Presumably the state law claims raised in federal court by UCB will parallel those raised by the university in Superior Court should it decide to appeal the agency's decision.

ion." Under *Pan American,* 112 P.R.Off. Trans. at 991, the "answer [to a certified question] must be binding on all the parties," both in the Puerto Rico court and in the federal court. *Id.* Arguably, an answer that the agency here had acted outside statutory authority, being unenforceable by the federal court (which alone has jurisdiction over the parties), would be a mere "advisory" opinion, hence improper for the Puerto Rico court to render under the Puerto Rico Constitution.[1] *Commwealth v. Aguayo,* 80 P.R.R. 534 (1958). While we cannot know for sure whether this reason influenced the Puerto Rico justices, it is quite possible that the precedential effect of their judgment, if any, will be limited to cases of such a nature.

Given the above, I am less fearful of intolerable negative consequences upon the future use of certification. This is not to say that I do not join my colleagues in their comments about the importance to Puerto Rico of certification—merely· that I do not believe that our colleagues on the Supreme Court of Puerto Rico intended to set a precedent significantly reducing the availability of certification.[2]

### II.

The *Pennhurst* decision was, of course, one of the complicating factors of this case, as noted above and as my colleagues strenuously point out. I question, however, whether *Pennhurst* deserves the opprobrium this court implies in part IV. The principle underlying *Pennhurst,* that federal courts should not tell state agencies how to interpret state law, is a basic element of our system. How to accommodate this with other competing principles in a way that pleases is not easy. The Supreme Court has struck a particular balance and, without suggesting that respectful criticism from a lower court is always inappropriate, I think our court's implied criticism here is overdone.

Moreover, even acknowledging that the *Pennhurst* rule may sometimes be trouble-

some, the present case seems to me a poor one to select as an example of its vices. In hindsight, I think we overestimated the force of the First Amendment claim. This is shown by the ease with which we have today dispatched that claim. Underlying *Ashwander* and *Pullman* is the principle that courts should not adjudicate *complicated* constitutional issues if avoidable. *See Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 236, 104 S.Ct. 2321, 2327, 81 L.Ed.2d 186 (1984) ("unsettled questions of state law must be resolved before a *substantial* federal constitutional question can be decided") (emphasis supplied). As the constitutional question resolved here appears not to have been complicated, the fact that *Pennhurst* may have deprived us of a prior adjudication in the Commonwealth courts hardly seems a cause for serious alarm.

---

1. Compare this with the Massachusetts Supreme Judicial Court, which is entitled to issue advisory opinions.

2. Since the *Cuesnongle* opinion was issued, we have received a response to a certified question from the Supreme Court of Puerto Rico. *Silva Wiscovich v. Weber Dental Manufacturing Co.,* No. CE–86–606, slip op. (P.R. Nov. 10, 1987).