**SOUTHERN UNION COMPANY d/b/a New England Gas Company, Plaintiff,**

v.

**Patrick LYNCH, in his capacity as Attorney General of the State of Rhode Island, Rhode Island Department of Labor and Training, and The Bureau of Pipefitters and Refrigeration Technicians, Fire Protection Sprinkler Contractors and Journeypersons, Sprinkler Fitters, Sheet Metal Contractors and Journeypersons, Sheet Metal Workers, and Oil Heat Contractors, Defendants.**

C.A. No. 02–405S.

United States District Court, D. Rhode Island.

June 18, 2004.

---

Robert P. Brooks, W. James McKay, Michael D. Chittick, Jeffrey K. Techentin, Adler Pollock & Sheehan, Providence, RI, for plaintiff.

Anne T. Turilli, Joseph R. Gaeta, Office of the Attorney General of RI, Providence, RI, Valentino D. Lombardi, RI Division of Labor and Training, Cranston, RI, for defendants.

## DECISION AND ORDER

SMITH, District Judge.

The State of Rhode Island (State) requires that all pipefitters possess a "PJF/Natural Gas Service Journeyperson II, Ltd." license (License) to perform any pipefitting work in a residence within the State. Plaintiff New England Gas Company (NEG or Plaintiff), a public utility company that provides natural gas services to Rhode Island residents, performs work on gas lines that are located both inside and outside its customers' homes. In this case, Plaintiff challenges the State's right to require NEG's employees to obtain a License in order to perform certain job functions that take such employees into customers' homes.

Before the Court are the following motions: (1) Defendants' Motion for Summary Judgment; (2) NEG's Motion for Partial Summary Judgment; (3) Defendants' "Motion to Dismiss" Pursuant to Federal Rule of Civil Procedure 12(c); and (4) Defendants' Motion to Dismiss Based on Abstention, or in the Alternative for Certification of Questions of State Law. On October 10, 2003, the Court heard oral argument on these motions and requested that the parties submit omnibus memoranda summarizing all of their respective contentions. These were filed on November 10, 2003. For the reasons that follow, the Court dismisses Counts II and III without prejudice on Eleventh Amendment grounds and grants summary judgment for Plaintiff as to Count I.

### I. *Background*

Plaintiff alleges that it has an exclusive franchise with respect to natural gas delivery in Rhode Island and is regulated by the United States Department of Transportation (USDOT), the Rhode Island Public Utilities Commission (PUC), and the Rhode Island Division of Public Utilities and Carriers (DPUC). The Rhode Island Department of Labor and Training (DLT), an agency of the State, maintains that workers performing certain activities in the natural gas system in Rhode Island must obtain the License, which is set forth in the "Pipefitters Act," R.I. Gen. Laws § 28–27–1, *et seq.* The DLT's Rules and Regulations describe the License in these relevant terms:

> Limited to installing headers and reconnection of gas service to existing equipment and related piping. Service work on natural gas burners and service of appliances and warm air heating equipment, which are fueled by natural gas.... Applicants for a [License] must show proof of completion of a trade sponsored program or a trade related

program offered by a recognized college. All programs must be approved by the [DLT]. The minimum formal training period for the [License] shall be two hundred and twenty (220) hours of combined classroom and laboratory technical training, approved by the [DLT].... The [License] is limited to service work on natural gas burners—not to exceed 500,000 BTU's residential, and 500,000 BTU's commercial.

Pl. Omnibus Mem. at Ex. A, p. 20.

In May 2002, Defendants sued in Rhode Island Superior Court, Providence County, to enjoin Plaintiff's employees from operating without the License, *see Whitehouse v. Southern Union Co.*, C.A. No. 02–2329, but that action (for reasons the parties do not make clear) was voluntarily dismissed without prejudice.

In August 2002, new regulations were promulgated under the Act, Plaintiff asserts on an emergency basis and without public notice and comment (New Regulations). The New Regulations expressly require Plaintiff's workers to obtain the License.

Plaintiff claims: (I) federal preemption of the Pipefitters Act by certain provisions of the Natural Gas Pipeline Safety Act, 49 U.S.C. § 60101, *et seq.* (NGPSA), and the USDOT's regulations thereunder, 49 C.F.R. § 192; (II) state preemption of the Pipefitters Act by Rhode Island's Public Utilities Commission Act, R.I. Gen. Laws § 39–1–1, *et seq.;* (III) exemption under a provision of the Pipefitters Act, R.I. Gen. Laws § 28–27–29; (IV) invalidity of the New Regulations under the Rhode Island Administrative Procedures Act, R.I. Gen. Laws § 42–35–3; (V) violation of the Contract Clause of the U.S. Constitution; and (VI) invalidity of the Pipefitters Act for vagueness. Plaintiff sought declaratory and injunctive relief as to all Counts, but Counts IV, V, and VI were dismissed by stipulation without prejudice because the State has enacted new regulations which make these Counts moot. This leaves Counts I, II, and III for resolution.

## II. *Standards of Review*

Both parties move for summary judgment, Defendants *in toto* and Plaintiff in part. Defendants also move for dismissal pursuant to Fed.R.Civ.P. 12(c) and on theories of Eleventh Amendment immunity and abstention. The Court must apply different standards of review to each set of motions.

Rule 56(c) states that a party shall be entitled to summary judgment

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). When ruling on a motion for summary judgment, this Court must review the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in the nonmoving party's favor. *Rochester Ford Sales, Inc. v. Ford Motor Co.*, 287 F.3d 32, 38 (1st Cir.2002); *Mesnick v. General Electric Co.*, 950 F.2d 816, 820 (1st Cir. 1991); *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990).

By contrast, in reviewing a Rule 12(c) motion, a court must accept all of the non-movant's well-pleaded factual averments as true and draw all reasonable inferences in his or her favor. *Rivera–Gomez v. de Castro*, 843 F.2d 631, 635 (1st Cir.1988); *see Int'l Paper Co. v. Town of Jay*, 928 F.2d 480, 482 (1st Cir.1991). The court may not grant a Rule 12(c) motion unless it appears beyond a doubt that the non-movant can prove no set of facts in support

of his or her claim or defense which would entitle the movant to prevail thereon. *Rivera–Gomez,* 843 F.2d at 635; *see Int'l Paper Co.,* 928 F.2d at 482–83.

## III. *Analysis*

Defendants argue that the Eleventh Amendment to the United States Constitution and various federal abstention doctrines and other theories of justiciability immunize Defendants from this lawsuit. These questions necessarily antecede an examination of the merits of Plaintiff's preemption claims.

### A. *The Eleventh Amendment and the Pennhurst Rule*

■ The Eleventh Amendment[1] "renders a State 'immune from suits brought in federal courts by her own citizens as well as by citizens of another State,' unless the State expressly waives the immunity or Congress abrogates it." *De Leon Lopez v. Corporacion Insular de Seguros,* 931 F.2d 116, 121 (1st Cir.1991) (citations omitted). The Plaintiff has not contested that the State is the "real, substantial party in interest" in this case. *See Ford Motor Co. v. Dep't of Treasury of Indiana,* 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945). There consequently is no dispute that this lawsuit, although nominally against Attorney General Lynch in his official capacity and two State agencies, is "against the State" for Eleventh Amendment purposes. *See O'Neill v. Baker,* 210 F.3d 41, 47 n. 5 (1st Cir.2000) (in the absence of any argument to the contrary, court assumed that state agency was an arm of the state).

As noted at the outset, Counts II and III of the Complaint advance state law-based theories and request injunctive and declaratory relief. The Court has supplemental subject matter jurisdiction over these claims under 28 U.S.C. § 1367 because the theory undergirding Count I, federal preemption, raises a federal question. In *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), the Supreme Court held that Eleventh Amendment sovereign immunity prohibits federal courts from ordering state officials to conform their conduct to state law. This jurisdictional bar applies where, as here, state law claims have been brought into federal court utilizing this Court's supplemental jurisdiction. *Id.* at 121, 104 S.Ct. 900. It also "applies regardless of the nature of the relief sought." *Id.* at 100, 104 S.Ct. 900 (citing *Missouri v. Fiske,* 290 U.S. 18, 27, 54 S.Ct. 18, 78 L.Ed. 145 (1933) ("Expressly applying to suits in equity as well as at law, the [Eleventh] Amendment necessarily embraces demands for the enforcement of equitable rights and the prosecution of equitable remedies when these are asserted and prosecuted by an individual against a State.")).

Notwithstanding the statements in *Fiske* and *Pennhurst,* Plaintiff alleges that neither *Pennhurst* nor any subsequent First Circuit authority explicitly extends the Eleventh Amendment jurisdictional bar to private actions against states for *declaratory* relief. Pl. Omnibus Mem. at 48. Therefore, Plaintiff asks this Court to apply the *Pennhurst* rule only insofar as Counts II and III request injunctive relief.

It is true that neither the First Circuit nor the Supreme Court has expressly addressed, in anything other than dicta, the application of the *Pennhurst* rule to ac-

---

1.  The Amendment reads:
    The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.
    U.S. Const. amend. XI.

tions for declaratory relief. *Pennhurst* itself dealt with legal and injunctive relief. 465 U.S. at 92, 104 S.Ct. 900. The plaintiffs in *Cuesnongle v. Ramos,* 835 F.2d 1486 (1st Cir.1987)—the First Circuit's most exegetic treatment of *Pennhurst*—requested that the court enjoin Puerto Rican officials and agencies from "interfering, meddling, encroaching or entangling with or in the internal affairs and educational process and mission of Plaintiffs." *Id.* at 1489. The court offered the following footnoted dictum with respect to the type of relief that *Pennhurst* proscribes:

> We presume that *Pennhurst* would bar the federal court from issuing the injunction prayed for in this case. It has been suggested, however, that *Pennhurst* sovereign immunity doctrine possibly extends only to the sort of injunctive relief sought in *Pennhurst,* i.e., far-reaching, "affirmative" relief that requires state officials to conform to a detailed regulatory system as prescribed by state law. Where the relief requested is less systemic and intrusive, perhaps the Eleventh Amendment does not prohibit federal enforcement of state law. *See* David L. Shapiro, Comment, *Wrong Turns: The Eleventh Amendment and the Pennhurst Case,* 98 Harv. L.Rev. 61, 83 & n. 127 (1984).[2] This view may well be correct; perhaps the sort of "prohibitive" injunction sought here does not rise to the level of interference that triggers sovereign immunity. But this is not the case in which to evaluate this distinction. We assume,

without deciding, that the Eleventh Amendment bars the relief requested by [plaintiff] in its federal complaint. *Id.* at 1498 n. 9.

But this delimited reading of the *Pennhurst* doctrine expressed in 1987 has not taken root in the First Circuit or elsewhere. In *O'Neill v. Baker,* the plaintiff's claims for injunctive and monetary relief against the Massachusetts Department of Social Services were deemed barred by the Eleventh Amendment. 210 F.3d at 47. The First Circuit in that 2000 case expressly reaffirmed *Pennhurst's* directive that "this jurisdictional bar applies regardless of the nature of the relief sought," though it is true that *O'Neill* itself did not involve declaratory relief. *Id.*[3]

Other courts facing this issue generally have applied the *Pennhurst* doctrine to actions seeking declaratory relief for alleged violations of state law. *See, e.g., MSA Realty Corp. v. State of Illinois,* 990 F.2d 288, 295 (7th Cir.1993) ("The point of *Green* [*v. Mansour,* 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985) ] is that declaratory relief should not be awarded where the eleventh amendment bars an award of monetary and injunctive relief; otherwise, the relief would operate as a means of avoiding the amendment's bar."); *Benning v. Board of Regents of Regency Universities,* 928 F.2d 775, 778 (7th Cir.1991) ("Regardless of the Eleventh Amendment status of the Board of Regents for the purpose of monetary damages, the Eleventh Amendment does preclude Benning's request for declaratory relief.")[4]; *Tolman*

---

**2.** Professor Shapiro's widely cited article also questions whether the *Pennhurst* rule would bar declaratory relief. *Id.* at 82 ("Surely, the problems of intrusion raised by an order to act or not to act, coupled with the difficulties of implementation and enforcement, are greater than the difficulties caused by a simple declaration of rights and duties.").

**3.** *Craveiro v. Lamoureux,* 37 F.3d 1484, 1994 WL 580258 (1st Cir.1994) (table) is unpublished, but it disposed of the appellant's claims for declaratory and injunctive relief by reliance on the *Pennhurst* rule.

**4.** The Seventh Circuit elucidated the reason for this holding in the following discussion:
> Benning seeks to circumvent the rule enunciated in *Pennhurst,* however, by re-

*v. Finneran,* 171 F.Supp.2d 31, 38 (D.Mass.2001) (*Pennhurst* rule applies to requests for declaratory relief); *Leventhal v. Vista Unified School Dist.,* 973 F.Supp. 951, 956 (S.D.Cal.1997) (same).

The language in *Pennhurst,* in conjunction with the authority cited above, persuade this Court to apply its holding to private actions "against the State" seeking declaratory relief for violations of state law. Count II asks the Court to declare that the New Regulations are preempted by a Rhode Island statute. Count III asks the Court to declare that a specific provision of the Pipefitters Act exempts the Plaintiff from the New Regulations. Both Counts also seek an injunction against the State from enforcing the New Regulations based on their respective state statutory theories. This Court will not make declarations about whether the State has abided by its own laws, just as it will not (and, Plaintiff concedes, cannot) enjoin State officials on those same grounds; to hold

otherwise would eviscerate *Pennhurst.*[5] Counts II and III are therefore dismissed without prejudice to refiling in state court.[6]

**B.** *Pullman and Younger Abstention*

Having disposed of Counts II and III, the Court proceeds along the course mapped by the First Circuit:

> There are two options for a post-*Pennhurst* plaintiff who wishes to bring a claim for injunctive relief[7] against state officials under alternative federal and state theories: either to litigate both federal and state claims in state court, or to bifurcate the litigation so that the state claims are heard in state court and the federal claims are heard in federal court.
>
> If the plaintiff wishes the federal court to address the federal claims, bifurcation will be the only option. In that circumstance, the federal cause of action will be grounded exclusively on federal law, even where state law causes

questing a mere *declaration* that the Board violated state law. But the only advantage Benning could derive from such a declaration would be to present it in state court proceedings as *res judicata* on the issue of liability, leaving to state courts the mechanical process of tabulating damages. When a declaratory judgment "would have much the same effect as a full-fledged award of damages or restitution by the federal court, the latter kinds of relief being of course prohibited by the Eleventh Amendment," the Supreme Court has denied declaratory relief. *Green v. Mansour,* 474 U.S. 64, 73, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985). The same reasoning condemns Benning's claim for declaratory relief. Here, issuance of a federal declaratory judgment as a step toward a state damage or injunctive remedy would operate as an end-run around *Pennhurst* that is equally forbidden by the Eleventh Amendment.
*Benning,* 928 F.2d at 778 (emphasis in original).

**5.** Plaintiff alternatively contends that *Pennhurst* does not bar the Court from entertaining state law claims that are "preliminary to"

the resolution of federal claims. Pl. Omnibus Mem. at 48 n. 32 (citing *Local 851, Teamsters v. Thyssen Haniel Logistics,* 90 F.Supp.2d 237, 247 (E.D.N.Y.2000)). That recognized exception to *Pennhurst* has no application here. Unlike in *Local 851,* there is no factual or legal relationship between, on the one hand, the federal preemption claim (based on the NGPSA) and, on the other, the state preemption claim (based on the Public Utilities Commission Act) or the state exemption claim (based on the Pipefitters Act).

**6.** Though Defendants seek judgment on the pleadings pursuant to Rule 12(c) as to Counts II and III, the Court will dismiss these claims pursuant to Rule 12(b) in order to give Plaintiff the opportunity, if it chooses, to pursue them in state court.

**7.** As explained in section III(A) *supra,* this Court will apply the *Pennhurst* rule to the requests for declaratory as well as injunctive relief.

of action might be dispositive.... Therefore, in those cases where it cannot use *Pullman* abstention, the court must reach the federal constitutional questions, in violation of the *Siler* principle.[8]

835 F.2d at 1497 (footnote omitted). As a result of the dismissal without prejudice of Counts II and III, Count I remains orphaned in this Court. This writer infers from Plaintiff's decision to file in federal court its "post-*Pennhurst*" choice to have this Court proceed to consider its federal question claim on the merits.

Defendants urge the Court to abstain from resolving the federal · preemption claim (Count I) on the grounds enunciated in *R.R. Comm'n v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) and *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Abstention, however, is " 'an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it,' " and should be invoked in only " 'exceptional circumstances.' " *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) (citation omitted); *see also Cruz v. Melecio*, 204 F.3d 14, 25 (1st Cir.2000) (the presence of a federal issue is always a major consideration weighing against surrender of federal jurisdiction) (citation omitted).

■ *Pullman* abstention thus may be appropriate in the following exceptional circumstances:

> when a federal constitutional claim is premised on an unsettled question of state law, the federal court should stay its hand in order to provide the state courts an opportunity to settle the underlying state law question and thus avoid the possibility of unnecessarily deciding a constitutional question.

*Harris County Comm'rs Court v. Moore*, 420 U.S. 77, 83, 95 S.Ct. 870, 43 L.Ed.2d 32 (1975). The First Circuit examines two factors to gauge the propriety of *Pullman* abstention: "(1) whether there is substantial uncertainty over the meaning of the state law at issue; and (2) whether a state court's clarification of the law would obviate the need for a federal constitutional ruling." *Ford Motor Co. v. Meredith Motor Co.*, 257 F.3d 67, 71 (1st Cir.2001).[9]

■ There is little ambiguity or uncertainty about the meaning of the provisions at issue in either the Public Utilities Commission Act or Pipefitters Act. R.I. Gen. Laws § 39–1–1(c) grants to the PUC and the DPUC "the exclusive power and authority to supervise, regulate, and make orders governing the conduct of companies offering to the public in intrastate commerce energy ... services." That language is not unclear, and Defendants point to no ambiguity that would necessitate a state court's illuminating interpretation.

**8.** *Siler v. Louisville & Nashville Railroad Co.*, 213 U.S. 175, 193, 29 S.Ct. 451, 53 L.Ed. 753 (1909), established that "[i]f a state statute might be construed so as to moot or alter materially the constitutional questions, then the state law question should be resolved first." *Cuesnongle*, 835 F.2d at 1496.

**9.** Clearly, were a state court to determine that the Public Utilities Commission Act preempted the New Regulations of the Pipefitters Act (Count II), there would be no need to decide whether the NGPSA also preempts the New

Regulations. Similarly, if NEG succeeded in state court on its claim of exemption under the Pipefitters Act from the License requirement (Count III), this Court would not need to confront federal preemption. · But this does not mean that there is "uncertainty over the meaning of the state law at issue," nor does obviating the need to decide the issue raised by Count I amount to a "clarification" simply because it relieves the Court of answering the federal question.

Moreover, the Rhode Island Supreme Court has examined the preemptive force of section 31–1–1 at least twice. *See Town of East Greenwich v. Narragansett Elec. Co.*, 651 A.2d 725, 729 (R.I.1994) ("By granting this authority to the PUC, the General Assembly has expressed its intent to entirely preempt town and city regulatory activity in the 'field of public-utilities regulation.'") (citation omitted); *Town of East Greenwich v. O'Neil*, 617 A.2d 104, 110 (R.I.1992) (the PUC has exclusive authority to regulate public utilities).

Similarly, the Court cannot discern any meaningful ambiguity in the language of R.I. Gen. Laws § 28–27–29 that cries out for abstention. That provision states in relevant part:

> **Persons and acts exempt.**—(a) The provisions of this chapter shall not apply to persons classified as maintenance personnel regularly in the employ of a public utility company doing utility company work, hospitals, schools, city, town or state employees regularly employed as maintenance personnel on the premises of the employer, and to any person employed in a plant maintenance department.
>
> (b) "Maintenance" is confined to the specific premise and means preserving or repairing anything that exists, and can be maintained by persons regularly employed within a specific building or complex. Normally, city or town permits are not required for this work, nor is a state pipefitters/refrigeration or sheet metal workers license.

*Id.* It is true that there are no state court decisions interpreting this (or any) provision of the Pipefitters Act, and the parties disagree about the application of the exemption to NEG's workers. Defendants contend that the exemption only pertains to NEG employees who are working at or on NEG facilities; Plaintiff argues that the exemption applies to those of its employees who perform "maintenance" duties, including those who work in customers' homes. For purposes of deciding the abstention question only, this Court agrees with Plaintiff and finds Defendants' reading unconvincing. The provision clearly contemplates three categories of exemption. First, "maintenance personnel" in NEG's (or any other public utility company's) employ who "preserv[e] or repair[ ] anything that exists" on any "specific premise[s]" (as the definition of "maintenance" in subsection (b) indicates), which would include any given customer's home, are exempt. Second, "maintenance personnel" who are employees of hospitals, schools, cities, towns, or the state, and who work regularly on their employer's premises, are exempt. Finally, persons "employed in a plant maintenance department" are exempt.

In consequence, the Court does not believe that the exemption provision of the Pipefitters Act is sufficiently ambiguous or unclear to warrant abstention from deciding the federal claim under the *Pullman* doctrine. *See Harman v. Forssenius*, 380 U.S. 528, 534–35, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965) ("If the state statute in question, although never interpreted by a state tribunal, is not fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question, it is the duty of the federal court to exercise its properly invoked jurisdiction."). Moreover, the Court is mindful that abstaining under *Pullman* would impose a considerable (and entirely unnecessary and avoidable) delay on the parties: this case has been pending in this Court for over one year and a half, and abstention would require a second cycle of litigation in state court, with the possibility (depending on the state court resolution) of returning to this Court once again.

That result is as inefficient as it is unwarranted. *See Cuesnongle,* 835 F.2d at 1499 (refusing to order the district court to abstain by reference to the Supreme Court's warning that "because of the delays inherent in the abstention process and the danger that valuable federal rights might be lost in the absence of expeditious adjudication in the federal court, abstention must be invoked only in 'special circumstances.' ") (citing *Harris,* 420 U.S. at 83, 95 S.Ct. 870).

■■ The Defendants also argue that the Court should invoke *Younger* abstention. "*Younger* is a court-made rule of abstention built around the principle that, with limited exceptions, federal courts should refrain from issuing injunctions that interfere with ongoing state-court litigation, or, in some cases, with state administrative proceedings." *Maymo–Melendez v. Alvarez–Ramirez,* 364 F.3d 27, 31 (1st Cir.2004). Here, the dispute centers around whether there is an "ongoing administrative proceeding" that would trigger *Younger* abstention. In April 2002, the DLT issued several Notices of Violation (Notices) to NEG for failure to comply with its regulatory framework. Defendants argue that the enforcement of the Notices is ongoing and that this Court therefore should wait for a state administrative resolution before confronting the federal question.

The Court rejects this argument for three reasons. First, Defendants concede that they have taken no action for over two years to enforce the Notices. Second, Defendants admit that they have no intention of ever enforcing the Notices—they have been indefinitely "tabled." Much like a tree that falls in the forest and is never heard, a citation that issues and is never enforced can hardly be said (outside the realm of metaphysics) to exist. Certainly, it would be absurd to find that there is an "ongoing" administrative proceeding to enforce the citation in such circumstances. *See Maymo–Melendez,* 364 F.3d at 32 ("There is some sense to a mechanical rule that *Younger* does not apply where the state litigation has not yet begun[.]"). Third, *Younger* abstention depends on the ability of the state tribunal to adjudicate the federal claims and defenses. *See Brooks v. New Hampshire Supreme Court,* 80 F.3d 633, 638 (1st Cir.1996). Whatever administrative mechanism the DLT uses to enforce its Notices cannot also resolve the federal preemption question presented here. *Younger* abstention therefore is not appropriate in this case and the Court now turns to the merits of the federal preemption claim.[10]

### C. *Federal Preemption*

■ There are two species of preemption—express and implied. *See Pharmaceutical Research & Mfrs. of Am. v. Concannon,* 249 F.3d 66, 74 (1st Cir.2001),

**10.** Defendants also contend that the Court lacks subject matter jurisdiction over the action because Plaintiff's federal preemption claim calls for an advisory opinion. The argument is that since all NEG workers service appliances in customers' homes, and since Plaintiff concedes that the License is valid as to those who service appliances, Plaintiff's preemption claim is not a "case or controversy" within the meaning of Article III of the Constitution.

This claim is readily dispatched. As Plaintiff indicates, there is no evidence in the record that each and every NEG employee who services gas pipelines also, and of necessity, services home appliances. In fact, Charles W. Wright, an employee of the DLT, stated by affidavit that "natural gas customer field services technicians" may perform a number of functions, one of which is appliance service. Pl. Omnibus Mem. at Ex. E, ¶ 6. It does not logically follow that all such employees perform appliance service.

*aff'd sub nom. Pharmaceutical Research and Mfrs. of Am. v. Walsh,* 538 U.S. 644, 123 S.Ct. 1855, 155 L.Ed.2d 889 (2003).[11] Several general rules of interpretation set the stage for a preemption analysis. First, although there is a presumption against federal preemption when Congress legislates in a field traditionally occupied by the states, the presumption is inapplicable in fields where the federal government has had a longstanding regulatory presence. *See United Parcel Service, Inc. v. Flores–Galarza,* 318 F.3d 323, 336 (1st Cir.2003). Second, "[a] pre-emption question requires an examination of congressional intent." *Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 299, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988). Third, "[t]he best indication of Congress's intentions, as usual, is the text of the statute itself." *South Port Marine, LLC v. Gulf Oil Ltd. P'ship,* 234 F.3d 58, 65 (1st Cir.2000). Finally, to determine Congress' intent, the Court must consider not only the statute itself but the federal regulations implementing and explaining it. *See Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 699, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984). With these guidelines in mind, the Court turns to the federal statute in question, the NGPSA.

Congress' first foray into the regulation of natural gas came with the Natural Gas Act of 1938, 15 U.S.C. § 717, *et seq.* (NGA), wherein it "establish[ed] federal regulation over most of the wholesale transactions of electric and gas utilities engaged in interstate commerce, and created the Federal Power Commission ... (now the Federal Energy Regulatory Commission [FERC]) ... to carry out that task." *Schneidewind,* 485 U.S. at 295 n. 2, 108 S.Ct. 1145 (citation omitted).

"The NGA confers upon FERC exclusive jurisdiction over the transportation and sale of natural gas in interstate commerce for resale." *Id.* at 300–01, 108 S.Ct. 1145.

In 1968, Congress increased its control over the field of natural gas transportation by passing the NGPSA, which "provide[d] for the prescription and enforcement of minimum Federal safety standards for the transportation of natural and other gas by pipeline and for pipeline facilities." H.R. No. 1390, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.C.C.A.N. 3223. The NGPSA's general purpose is to establish "minimum safety standards for pipeline transportation and for pipeline facilities," and its standards apply, *inter alia,* "to owners and operators of pipeline facilities." 49 U.S.C. § 60102(a)(2)(A). The comprehensive regulatory scheme embodied by the NGA and NGPSA

> governs virtually every aspect of the transportation and sale of natural gas. It includes provisions for determining the price at which natural gas m[a]y be sold, whether natural gas facilities may be built or modified, where they may be [ ] located, the methods by which they are constructed, and the safety standards that must be observed.

*Lng v. Loqa,* 79 F.Supp.2d 49, 51 (D.R.I. 2000).

In the NGPSA, Congress explicitly expressed its intention to preempt all state regulation in the area of pipeline safety unless such state efforts meet specific requirements:

> (c) Preemption.—A State authority that has submitted a current certification under section 60105(a)[12] of this title

---

**11.** "Conflict preemption" and "field preemption" are often classified as subspecies of implied preemption. *See Massachusetts Ass'n of Health Maintenance Orgs. v. Ruthardt,* 194 F.3d 176, 179 (1st Cir.1999).

**12.** 49 U.S.C. § 60105(a) provides:
   State certifications
   (a) General requirements and submission.—Except as provided in this section and sections 60114 and 60121 of this title,

may adopt additional or more stringent safety standards for intrastate pipeline facilities and intrastate pipeline transportation only if those standards are compatible with the minimum standards prescribed under this chapter. A State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation.

49 U.S.C. § 60104(c). Thus, "the statute is clear that its jurisdiction extends to all pipeline facilities, whether intrastate or interstate, engaged in the transportation of gas in or affecting interstate or foreign commerce—*i.e.,* to the extent of Congress's legislative jurisdiction under the Commerce Clause." *Five Flags Pipe Line Co. v. United States Dept. of Transp.,* Civ. A. No. 89–0119JGP, 1992 WL 78773, at *6 (D.D.C. Apr.1, 1992).

The parties agree that NEG's natural gas distribution network is (with minor exceptions) intrastate, not interstate. *See* Pl. Mem. Supp. Obj. at 8 n. 5. Plaintiff therefore focuses on the intrastate preemption principle of section 60104(c), arguing that Defendants have not met its several requirements (section 60105(a) certification, "more stringent safety standards," and compatibility with the minimum standards of the NGPSA) and that the New Regulations establishing the License are therefore preempted.

Defendants' primary response is that section 60104(c) is inapplicable to the License, and that the DLT does not need to apply for certification under section 60105 because the License is outside the purview of the NGPSA. Defendants argue that this is so because the NGPSA does not regulate activities "beyond the service line onto a customer's premises and equipment." Def. Supp. Mem. at 7. Defendants would require a License only for those NEG employees who either (1) reconnect or reactivate gas service on a customer's premises, or (2) service a customer's existing natural gas equipment, appliances, burners, boilers, and related piping on the customer's premises and beyond the "service line" (whose definition is discussed *infra* ). *Id.* at 9. Since the NGPSA allegedly does not regulate these activities, Defendants argue that it also does not preempt the New Regulations.

Section 60104(c), by its relevant terms, governs "safety standards for intrastate pipeline facilities and intrastate pipeline transportation." In order to understand the preemptive breadth of the NGPSA, it is necessary to examine the respective meanings of "intrastate pipeline facilities" and "intrastate pipeline transportation." 49 U.S.C. § 60101(a) sets out the following relevant definitions:

> (3) "gas pipeline facility" includes a pipeline, a right of way, a facility, a building, or equipment used in transporting gas or treating gas during its transportation[.]

> .　　.　　.　　.　　.

> (9) "intrastate gas pipeline facility" means—

>> (A) a gas pipeline facility and transportation of gas within a State not subject to the jurisdiction of the Commission under the Natural Gas Act (15 U.S.C. [§ ] 717 *et seq.*); and

>> (B) a gas pipeline facility transporting gas from an interstate gas pipeline

---

the Secretary of Transportation may not prescribe or enforce safety standards and practices for an intrastate pipeline facility or intrastate pipeline transportation to the extent that the safety standards and practices are regulated by a State authority ... that submits to the Secretary annually a certification for the facilities and transportation that complies with subsections (b) and (c) of this section.

in a State to a direct sales customer in that State buying gas for its own consumption[.]

. . . . .

(19) "pipeline transportation" means transporting gas and transporting hazardous liquid[.]

. . . . .

(21) "transporting gas"—

(A) means the gathering, transmission, or distribution of gas by pipeline. . . .

49 U.S.C. § 60101(a)(3), (9), (19), (21). 49 C.F.R. § 192.3 contains additional clarifying definitions. For example, "pipeline" means all parts of those physical facilities through which gas moves in transportation, including pipe, valves, and other appurtenance[s] attached to pipe, compressor units, metering stations, regulator stations, delivery stations, holders, and fabricated assemblies. *Id.* Lastly, "pipe" is defined as "any pipe or tubing used in the transportation of gas." *Id.*

The cumulative effect of these definitions makes plain that the preemptive force of section 60104(c) extends to all intrastate piping whose function is the transportation, conveyance, or distribution of natural gas. Moreover, 49 U.S.C. § 60102 provides for a broad spectrum of duties to which the safety standards prescribed by the NGPSA "may apply":

the design, installation, inspection, emergency plans and procedures, testing, construction, extension, operation, replacement, and maintenance of pipeline facilities[.]

49 U.S.C. § 60102(a)(2)(B). Thus, the NGPSA contemplates the control over and regulation of a massive expanse of natural gas-related activities, including those that occur on or inside a customer's premises. *See, e.g.,* 49 C.F.R. § 192.353 (providing for the proper and safe installation of individual customer gas meters "whether inside or outside of a building"); 49 C.F.R. § 192.379(c) (providing that "[t]he customer's piping must be physically disconnected from the gas supply and the open pipe ends sealed" under circumstances when a service line is not placed in operation); 49 C.F.R. § 192.727(d)(3) (requiring that the "customer's piping must be physically disconnected from the gas supply and the open pipe ends sealed" when a customer's gas service is discontinued).

Defendants attempt to narrow the scope of the NGPSA by calling attention to the definition of "service line":

a distribution line [13] that transports gas from a common source of supply to an individual customer. . . . A service line ends at the outlet of the customer meter or at the connection to a customer's piping, whichever is further downstream, or at the connection to customer piping if there is no customer meter.

49 C.F.R. § 192.3. Defendants would infer from this definition a spatial limitation of the NGPSA's regulatory power—i.e., that it applies only to activities occurring before the meter terminus, but not after.

The problem for Defendants is that section 60104(c) (the preemption provision) does not speak in terms of the service line—indeed, "service line" is not even mentioned in that provision. Rather, section 60104(c) discusses preemption in connection with the more comprehensive meanings of "intrastate pipeline facility" and "intrastate pipeline transportation."

---

**13.** It appears from the various definitions that a "service line" is the smallest subset of a "distribution line" or "main," which is "a distribution line that serves as a common source of supply for more than one service line." 49 C.F.R. § 192.3.

The NGPSA recognizes that states have a legitimate function to perform with respect to regulation of intrastate pipeline safety. It provides, however, a minimum standard for safety—a floor above which the state may add additional or more stringent requirements that can coexist with the federal framework. The line of demarcation is not, as Defendants argue, the connection to the house; nor may a state operate to the exclusion of federal authority (as Defendants also contend). Rather, the NGPSA permits a state to lay strata of additional safety measures on top of its basic federal safety standards.

From a practical standpoint, this obviously makes sense. There are many functions performed by NEG workers in fulfillment of their obligations under the NGPSA that require them to "touch equipment that is not a part of the federally-defined 'service line.'" Pl. Omnibus Mem. at 8. It therefore would be illogical to conclude that Congress intended the reach of the NGPSA's safety requirements to terminate at the meter, just short of where they may matter most—the customer's home. NEG's workers have job responsibilities that routinely require them to handle instruments that, though "downstream" from the meter, are unquestionably part of an "intrastate pipeline facility" or of a system of "intrastate pipeline transportation."[14]

It is true (as Plaintiff concedes) that the License, and not the NGPSA, applies to certain activities within the customer's premises. Work on "a boiler or a gasfired stove" within a customer's home "would clearly not be the operation or maintenance of the service line, and NEG

does not contend that such work would be preempted by the NGPSA." Pl. Omnibus Mem. at 18. But that concession is not at all the same as agreeing to the unsupportable general rule that the customer's meter (or the connection to a customer's piping) is the absolute terminus of the intrastate pipeline system, and therefore the outermost boundary of the NGPSA's regulatory authority. The process of reconnecting or reactivating gas at a customer's home is federally controlled because it is part of the "intrastate pipeline facility" or "intrastate pipeline transportation." Maintenance work on a gas-powered stove is not federally regulated for the obverse reason. Since the License purports to regulate activities within the NGPSA's bailiwick, it is preempted unless Defendants can demonstrate that the DLT is in compliance with the dictates of section 60104(c).[15]

Section 60104(c) explicitly requires a "State authority" that wishes to regulate "intrastate pipeline facilities and intrastate pipeline transportation" to submit an annual certification, pursuant to section 60105(a), to the Secretary of Transportation. Thus, it is the NGPSA itself which gives Rhode Island, through an appropriate state agency, the "opportunity to assume primary regulatory responsibility through the certification process, and which specifies in detail the information the states must submit to the agency in order to gain certification." *Five Flags Pipe Line*, 1992 WL 78773, at *6; *see also ANR Pipeline Co. v. Iowa State Commerce Comm'n*, 828 F.2d 465, 469 (8th Cir.1987) ("[E]ven with regard to intra-

---

**14.** Examples of such work, Plaintiff argues, include restoration of gas service, leak detection tests, and gas service initiation.

**15.** Congress' inclusion of an express preemption clause in the NGPSA renders the various doctrines of implied preemption inapplicable. *See Mendes v. Medtronic, Inc.*, 18 F.3d 13, 16 (1st Cir.1994).

state safety issues, the federal interest remains strong, and ... state regulatory authority is subject to federal approval.").[16]

The Defendants have presented no evidence that the DLT has ever sought a section 60105(a) certification.[17] This failure is mortal to Defendants' case. The statute is unqualified in its requirement of certification. The DLT's decision to regulate matters controlled by the NGPSA without concomitantly submitting the necessary certification statements to the Secretary of Transportation renders the New Regulations (and the License they create) invalid and federally preempted.[18]

## IV. *Conclusion*

For the foregoing reasons, the Court finds as follows:

A. Defendants' Motion for Summary Judgment is DENIED;

B. Counts II and III of the Complaint are DISMISSED without prejudice; and

C. Plaintiff's Motion for Partial Summary Judgment as to Count I is GRANTED.

IT IS SO ORDERED.

---

16. In support of its assertion that the NGPSA retains broad control over the regulation of intrastate natural gas safety, the *ANR Pipeline* court cited to the following portion of the NGPSA's legislative history:

The committee in nowise accepts the declaration that gas safety matters are primarily of local concern and subject to regulation by the States. On the contrary, it is the Federal safety standards which are in effect and the ultimate responsibility for establishment and enforcement of the Federal safety standards is the responsibility of the Secretary. The bill reported gives to the States in certain circumstances, a role in the enforcement of these standards. This role not only initially but annually is up for review. If the Secretary is not satisfied with the State's performance of the role, he is not bound by the State's certification, but may reject it.

*ANR Pipeline,* 828 F.2d at 469 (citing H.R.Rep. No. 1390, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.C.C.A.N. 3223, 3245).

17. Plaintiff raises a correlate question about whether the DLT may be deemed a "State authority" for purposes of this statute. It is certainly true that the PUC and the DPUC— not the DLT—are the State authorities traditionally responsible for regulating in this field. *See* R.I. Gen. Laws § 39–1–1(c) (granting to the PUC and DPUC "the exclusive power and authority" over "the conduct of companies offering to the public in intrastate commerce energy ...")). The Court need not resolve this question, however, because there is *no* section 60105(a) certification from *any* State authority in this record.

18. Given the Court's conclusion, it is unnecessary to explore Plaintiff's additional arguments that the License does not impose "additional or more stringent safety standards" or is incompatible with the NGPSA's "minimum standards." *See* 49 U.S.C. § 60104(c). The Court therefore expresses no opinion on these matters.