385 F.3d 81
 ASOCIACIÓN DE EDUCACIÓN PRIVADA DE PUERTO RICO, INC.; Puerto Rico Innovatives Education Services, Inc., d/b/a Colegio Tomás Alva Edison; Corporación Educativa Ramón Barquín, d/b/a/ American Military Academy; Academia Inmaculada Concepcion-Mayaguez; Southwestern Educational Society, Inc.; Guamaní School, Inc.; Colegio Adianez, Inc.; Antilles Military Academy, Inc.; Fundación
Educativa Concepción Martín, Inc., d/b/a/ Sonifel; Saint Francis School, Inc.; American School, Inc., Plaintiffs, Appellants,
v.
Javier A. ECHEVARRÍA-VARGAS, in his official capacity as Secretary of the Department of Consumer Affairs of the Commonwealth of Puerto Rico, Defendant, Appellee.
 No. 03-2703.
 United States Court of Appeals, First Circuit.
 Heard May 3, 2004.
 Decided October 5, 2004.
 
 Appeal from the United States District Court for the District of Puerto Rico, Héctor M. Laffitte, J.
 Antonio J. Amadeo-Murga, with whom Wanda I. Concepcion-Figueroa and Luis Roberto Pinero were on brief, for appellants.
 Camelia Fernandez-Romeu, Assistant Solicitor General, with whom Roberto J. Sanchez-Ramos, Solicitor General, and Kenneth Pamias-Velazquez, Deputy Solicitor General, were on brief, for appellee.
 Before TORRUELLA, Circuit Judge, COFFIN, Senior Circuit Judge, and LYNCH, Circuit Judge.
 LYNCH, Circuit Judge.
 
 
 1
 Asociación de Educación Privada de Puerto Rico, Inc., a nonprofit private association representing the interests of private primary, secondary, and post-secondary member schools in Puerto Rico, together with individual schools, filed a complaint on March 3, 2003, against the Secretary of the Department of Consumer Affairs of Puerto Rico ("DACO"). The complaint alleges that DACO's Regulation 6458, Regulations for the Disclosure of Information on the Sale and Distribution of Textbooks ("Reglamento para la Divulgacion de Informacion en la Venta y Distribucion de Libros de Texto") (the "Regulation"), violates the plaintiffs' First Amendment rights, and in particular, their right to academic freedom. The plaintiffs sought declaratory and injunctive relief.
 
 
 2
 The Secretary moved under Fed.R.Civ.P. 12(b)(6) to dismiss the complaint for failure to state a claim, and the district court granted the motion. The plaintiffs appeal that dismissal. We reverse the dismissal and remand the case to the district court for further proceedings.
 
 I.
 
 3
 The private schools of Puerto Rico are required by statute to operate under a license. 18 P.R. Laws Ann. § 2111. Puerto Rico's Secretary of Education is directed to "establish the standards and the requirements that shall be met by the educational institutions that request a license." 18 P.R. Laws Ann. § 2113. The Secretary of Education's power to regulate the schools is subject to a proviso protecting the schools' authority to develop their academic programs.[1]
 
 
 4
 Nonethless, DACO's Secretary has also asserted authority. DACO promulgated the Regulation in 2002. As its stated main objective, the Regulation aims to "protect[ ] Puerto Rican famil[ies] and parents, and/or tutors who register their minor children and/or wards in the private schools of Puerto Rico." Reg. 6458, R. 2. "Likewise, it is the intent to define the obligations and responsibilities of schools, bookstores, distributors, and publishing houses in relation to the corresponding processes pertaining to the sale of textbooks." Id.
 
 
 5
 The Regulation imposes several obligations on the schools. Rule 8 directs a school to announce, by May 15 of the current school year, what books will be used the following school year. Id. R. 8(A). Rule 9 specifies that schools must disclose final sales prices for the books and the agreement with the book seller. Id. R. 9(A). Rule 10 requires the schools to inform parents of price changes. Id. R. 10.
 
 
 6
 The specific provision challenged by the plaintiffs is found in Rule 11 of the Regulation:
 
 
 7
 In the case which [sic] there are changes in the edition, the school will inform in the book list which of these books have different editions, what the change specifically consists of, and whether it is a significant change or not, as defined by these regulations. In case that the changes are not significant, the school has to inform the parents on said list, that they have the option of buying the previous edition.
 
 
 8
 Id. R. 11. "Significant change in the new edition of a book" is defined in turn by Rule 4(A) as "historical, technological, scientific and/or cultural changes integrated in the new edition of a book that are significant and as such cause the total or partial revision of one or several chapters or sections and/or the inclusion of one or several chapters or sections." Id. R. 4(A). In contrast, "[t]he exclusion of chapters or sections, cosmetic changes and/or style, such as cover changes, chapter or section order, book texture and/or material does not constitute a significant change." Id."Additions of one or several sentences to one chapter or section or through a new book edition will not be considered a significant change nor the addition of one or several drawings, graphics, tables, or photos." Id. There is no explicit provision for resolving disputes between the Secretary and a school over whether a particular edition contains a "significant change."
 
 
 9
 Rule 12 requires schools to disclose to parents the existence and applicability of the Regulation. Id. R. 12. Schools must post a notice, in a sign not smaller than eight and a half inches by eleven inches, with a letter size not smaller than 22 points, not more than five feet away from a spot to which parents can have visual access, and between five and six feet from the ground, with the following language (in Spanish):
 
 
 10
 This school has the obligation to inform parents the pertinent process for book sale and distribution in accordance with the Regulations for the Release of Information about the Sale and Distribution of Textbooks of DACO. A copy of these regulations is available in our library. Not complying with the rules set forth in said regulations could lead to the levying of administrative fines in accordance with the DACO Organic Law.
 
 
 11
 Id. Thus, the Regulation is enforced with fines, and under the DACO Organic Law such fines can amount to $10,000.[2] See id. R. 18.
 
 II.
 
 12
 The district court, on the basis of the pleadings and without hearing evidence, determined that Rule 11 implicated plaintiffs' First Amendment interests and should be scrutinized as a time, place or manner restriction. Asoc. de Educ. Privada de Puerto Rico v. Echevarria Vargas, 289 F.Supp.2d 1, 4 (D.P.R.2003).
 
 
 13
 In doing so, the district court rejected the plaintiffs' contention that Rule 11 was a content-based restriction deserving of strict scrutiny, finding that "DACO's regulations only limit the manner in which the school curriculum is taught." Id. It analyzed the regulation's constitutionality under the intermediate scrutiny standard utilized in public forum cases.[3]
 
 
 14
 The district court concluded, on the pleadings, that Puerto Rico had "a significant interest in ensuring that parents do not unnecessarily pay for textbooks that contain stylistic changes." Id."Moreover, [the district court] believe[d] that the regulations do provide ample alternative channels of communication." Id. The court suggested that schools may persuade parents to purchase exclusively the latest editions of the books and noted, without mentioning federal copyright laws, a teacher's capacity to photocopy the changes missing in the older editions for those children whose parents chose not to purchase new editions. Id.
 
 
 15
 After addressing and rejecting the plaintiffs' argument that the government's interference with education called for stricter scrutiny, the district court held, on the Secretary's Rule 12(b)(6) motion, that the Regulation was constitutional; thus, the plaintiffs failed to state a claim. We reverse the district court's dismissal of the claim.
 
 III.
 
 16
 "A dismissal on the pleadings will be upheld only if it appears beyond doubt that the plaintiff can prove no set of facts in support of its claims which would entitle it to relief." Gaskell v. Harvard Coop. Soc'y, 3 F.3d 495, 497-98 (1st Cir.1993) (internal quotation marks, citations, and brackets omitted). At this stage, we cannot say that there are no possible set of facts on which the Regulation as implemented would be unconstitutional.
 
 
 17
 Plaintiffs' claim purports to rest primarily on a First Amendment right to protection of academic freedom, as well as on protection of a right to free speech. The parties agree that Puerto Rico is bound by the First Amendment. See Torres v. Puerto Rico, 442 U.S. 465, 469, 99 S.Ct. 2425, 61 L.Ed.2d 1 (1979).
 
 
 18
 The complaint is not precise about what free speech rights are involved here. The Regulation does not purport to address the content of speech; nor does it purport to regulate speech at all. Rather, the Regulation is a consumer protection regulation. As this court noted in Cuesnongle v. Ramos, 835 F.2d 1486 (1st Cir.1987), involving another DACO regulation, a private school has no First Amendment right to be free of consumer protection regulations. Id. at 1502. Further, Cuesnongle recognized the power of the government to some extent to compel disclosure of matters not harming associational or speech rights. Id. That is far from saying that plaintiffs here could not produce facts in support of a claim under the First Amendment.
 
 
 19
 More directly, the complaint asserts abridgment of academic freedom. "Academic freedom" receives some protection under the First Amendment and plaintiffs' complaint seeks the shelter of that protection. The term "academic freedom" means many things and protects many different interests. A number of those interests are plainly not at issue in this case.[4] And this case does not involve any direct infringement.
 
 
 20
 Still, "[t]hat the burden of which the [petitioner] complains is neither content-based nor direct does not necessarily mean that petitioner has no valid First Amendment claim." Univ. of Penn. v. EEOC, 493 U.S. 182, 199, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990). Content-neutral governmental action may, nonetheless, have effects on academic freedom. And "burdens that are less than direct may sometimes pose First Amendment concerns." Id.
 
 
 21
 From a reading of plaintiffs' complaint we have tried to identify the burdens which plaintiffs assert the Regulation imposes. Plaintiffs assert that the Regulation burdens the academic freedom of the schools and their teachers by 1) interfering with the right of the schools and their teachers to choose the textbooks they would like to use by means of restrictions such as requiring schools to disclose to parents, months in advance, the textbooks that would be used and the details of the book purchase contracts, 2) forcing the schools and teachers to accept and adapt to the use of different editions of a textbook in the same classroom (which might be described as a "Tower of Babel" situation), and 3) giving the Secretary of DACO the power to determine what constitutes a "significant" change between editions differently than what a school determines. As the plaintiffs remind us, the restrictions may be enforced with up to $10,000.00 in administrative fines.
 
 
 22
 We cannot say, in the absence of any evidence about the nature and weight of the burdens imposed and the nature and strength of the government's justifications, that plaintiffs have no possible claims. As such, the grant of the Rule 12(b)(6) motion was error. The parties on remand will have the opportunity to develop the facts needed to clarify these issues.
 
 
 23
 For example, by analogy to the academic freedom interests articulated by Justice Frankfurter, concurring in Sweezy v. New Hampshire, 354 U.S. 234, 255, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957), there are no facts as of yet on whether there has been any interference with the schools' ability to make their own decisions about "what may be taught" and "how it shall be taught." Id. at 263, 77 S.Ct. 1203 (internal quotations omitted).
 
 
 24
 There are simply no facts in the record about how the Regulation has been implemented, much less the burdens and benefits which have ensued. The record does not tell us how textbooks are used in private schools in Puerto Rico or when editions would normally be selected. Perhaps textbooks are little used; many schools today use reproduced copies of particular pages of text, often not from textbooks at all. There are no facts about the experience of private schools with substantive changes in different editions of the same textbooks. There are no facts about the actual effect in the classroom of using two fairly similar versions of the same textbook.
 
 
 25
 It may be, for example, that most teachers in Puerto Rico private schools only assign readings in textbooks as homework and do so by referring to chapters that cover specified subjects. If such is the case, the plaintiffs' allegations about "Tower of Babel" effects in the teaching in classrooms would be weakened. Conversely, if teachers make frequent references to specified textbook pages during classroom instruction and different editions are used within the same classroom, that concern may be strengthened.
 
 
 26
 Nor does the record show how often new editions of textbooks are produced or how often students in the same classroom are actually using different editions of a textbook. There are no facts on the availability of old editions for purchase (new or used) when new editions are released.
 
 
 27
 There are no facts of record on whether new editions are forced on teachers who feel they are unnecessary. If that is so, the Regulation may have the benefit of giving schools bargaining power with publishers and lowering the overall costs of new textbooks.
 
 
 28
 There are also no facts of record on whether the Secretary and a private school have ever disagreed on whether there was a significant change between editions. Nor are there facts of record about the precise nature and extent of the problem which the Regulation purports to address. There are no facts in the record about the particular role of private schools in Puerto Rico that may give the government a greater interest in the costs of textbooks for parents. Assuming there are cognizable burdens, there are no facts as to whether alternative, less intrusive, regulatory schemes would work just as well to satisfy any legitimate state interests.
 
 
 29
 The private school community of Puerto Rico embraces many schools, areas, levels, teachers, and 175,000 students. There may be a wide range and variety among them in textbook usage. But there are no facts in the record which we can examine to determine how wide spread may be any impact of the Regulation on the First Amendment concerns asserted by the plaintiffs. The Regulation has been in effect since May 2002, so answers to these inquiries should be available.
 
 
 30
 Where the challenged regulation is indirect and content-neutral, the question of whether the incidental burdens on speech or academic freedom trigger a First Amendment claim is a fact-sensitive one.[5] See Univ. of Penn., 493 U.S. at 201-02, 110 S.Ct. 577 (holding that plaintiff university failed to make out a cognizable First Amendment claim in light of speculative, attenuated, and remote harm); Ohio Assoc. of Independent Schools v. Goff, 92 F.3d 419, 424 (6th Cir.1996) (determining whether plaintiff had asserted an actionable First Amendment claim of denial of academic freedom only after development of facts); Cuesnongle, 835 F.2d at 1489-90 (same). Accordingly, the proper disposition of the case at this stage is to reverse the dismissal and remand for further proceedings to develop the factual record.
 
 
 31
 On remand, the facts may show no infringement of any interests protected by the First Amendment, as was the case in Univ. of Penn., 493 U.S. at 201-02, 110 S.Ct. 577. Yet the facts may show some significant infringement. If so, First Amendment analysis typically involves weighing the substantiality of the government's interests relative to the First Amendment burdens imposed and the availability of alternate means to accomplish the governmental objectives. The parties should brief to the district court the exact nature of the First Amendment issues at stake based on the evidence, including the appropriate standard of review. We agree with the district court that strict scrutiny is not appropriate on the case as framed; we disagree that plaintiffs' pleadings present no possible claims.[6] And we disagree that the government's interests self-evidently trump any First Amendment interests which have been burdened.
 
 
 32
 We reverse the dismissal under Rule 12(b)(6) and remand for further proceedings not inconsistent with this opinion. So ordered.
 
 
 
 Notes:
 
 
 [1]
 "The license to be issued by the Secretary by virtue of this subchapter will be institutional in nature and shall include the authorization to issue diplomas, certificates or degrees up to the maximum academic level established in the licenseProvided, [t]hat a private educational institution, by virtue of the license issued, and pursuant to academic autonomy this chapter provides, protects and fosters, may establish new academic programs, additional courses or any other academic measure, provided the same does not exceed the maximum academic level authorized by the license, nor modifies its institutional objectives or mission." 18 P.R. Laws Ann. § 2117 (emphasis added).
 
 
 [2]
 In contrast, "[a]ny natural or juridical person who operates a private educational institution as defined in this subchapter without the proper license provided therein shall be guilty of a misdemeanor and, upon conviction thereof, shall be punished with a fine not to exceed five hundred (500) dollars." 18 P.R. Laws Ann. § 2124
 
 
 [3]
 "[E]ven in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions `are justified [1] without reference to the content of the regulated speech, [2] that they are narrowly tailored to [3] serve a significant governmental interest, and [4] that they leave open ample alternative channels for communication of the information.'"See Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (quoting Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984))
 
 
 [4]
 This case does not involve the freedom of parents to direct the upbringing of their childrenSee Pierce v. Soc'y of Sisters, 268 U.S. 510, 534-35, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (parents have a liberty interest in directing the upbringing and education of their children). Nor is the Regulation an effort by the government to control or direct the content of speech engaged in by a university or those affiliated with it. See Sweezy v. New Hampshire, 354 U.S. 234, 250, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957) (government violated academic freedom of university professor by compelling disclosure of contents of lecture); Keyishian v. Board of Regents, 385 U.S. 589, 603-04, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) (law compelling loyalty oath violated academic freedom of university professors).
 
 
 [5]
 The district court analyzed the Regulation as a time, place, and manner restriction on speech and applied intermediate scrutiny. Without passing on the correctness of that analysis, we believe it is wiser to defer the determination of what standard of review to apply until the case, and the nature of the First Amendment burdens, if any, have been clarified through more factual development
 
 
 [6]
 The only issue squarely before us on appeal is whether the district court erred in granting the Rule 12(b)(6) motion
 
 
 
 33
 TORRUELLA, Circuit Judge, dissenting.
 
 
 34
 The regulation being challenged in this case is a bizarre and draconian measure. On its face it constitutes a major infringement on the academic freedom of appellant educational institutions, as guaranteed by the First Amendment of the Constitution. Regents of the Univ. of Cal. v. Bakke, 438 U.S. 265, 312, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (Powell, J., concurring) ("[a]cademic freedom ... long has been viewed as a special concern of the First Amendment"). To my knowledge, this regulation is unique in the annals of United States jurisdictions; appellees have not pointed to any similar legislation or authorization showing otherwise.
 
 
 35
 Of course, it is not this stamp of originality that causes the actions of the Government of Puerto Rico to infringe upon appellants' constitutional rights, but rather the subject matter that it attempts to regulate and the manner in which its authority is exercised over private academic institutions. See id. (among the four components of academic freedom are "what may be taught, [and] how it shall be taught") (emphasis added) (Frankfurter, J. concurring in the result) (quoting Sweezy v. New Hampshire, 354 U.S. 234, 263, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957)). A casual reading of the offending regulation serves to illustrate the point.[1]
 
 
 36
 The general objective of the regulation as stated in its Rule 2 is "protecting Puerto Rican family and parents ... who register their minor children in the private schools of Puerto Rico" by defining the "obligations and responsibilities of schools, books stores, distributors, and publishing houses in relation to the corresponding processes pertaining to the sale of textbooks." Although this is an ostensibly valid, if paternalistic, exercise of Puerto Rico's police powers, see Cuesnongle v. Ramos, 835 F.2d 1486 (1st Cir.1987) (a private school has no First Amendment right to be free of consumer protection regulations), one wonders why the state should interject itself into this aspect of a purely voluntary relationship inherent in private schooling, one which is merely a facet of choosing to pay for what is otherwise freely provided by the body politic. However, although the challenged regulation may be externally directed at consumer protection, it clearly transgresses into the area of how private schools and their alter egos, the teachers, are to teach, as well as the subject matter of what they can teach. This is quintessential interference with academic freedom, and "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." Shelton v. Tucker, 364 U.S. 479, 487, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).
 
 
 37
 A brief perusal of the various parts of the regulation, taken in context, clearly reveals how it interferes with the how and what of academic freedom, without need for further inquiry. Rule 8, a provision at the heart of this controversy, requires all private schools to "announce the books that will be used the next school year on or before May 15 of the previous school year, if this school year starts on August" (or a similar three month interval if it is other than August). This must be done by posting the information on a bulletin board located in a conspicuous place in the educational institution, and by contemporaneously providing the list to the Government and to the parents. The parents' list must contain "a briefing on the book, its title, author, publishing house, edition, and publishing year."
 
 
 38
 Concomitant with these provisions is Rule 11 which states that where there are "changes in the edition, the school will inform in the book list which of these books have different editions, what the changes specifically consists of, and whether it is a significant change or not," in which case the "school has to inform the parents ... that they have the option of buying the previous edition." The term "significant change" is defined by Rule 4(A) as
 
 
 39
 changes integrated in the new edition of a book that are significant and as such cause the total or partial revision of one or several chapters or sections. The exclusion of chapters or sections, ... [or changes in] chapter or section order ... do[ ] not constitute a significant change. Additions of one or several sentences to one chapter or section or through a new book edition will not be considered a significant change nor the addition of one or several drawings, graphics, tables, or photos.
 
 
 40
 Rule 12, on the other hand, requires all schools to disclose and notify parents and persons interested in enrolling their children of "the school policy regarding the addition, changes and modifications of the textbook list", and mandates the posting of a sign in the school, which must be at least 8 and 1/2 by 11 inches in size with lettering no smaller than 22 points, spelling out the school's obligations under the regulation and indicating the possibility of administrative fines in case of violations. Under Rule 18, these fines can be imposed against "[a]ny natural [ie., including individual teachers] or legal person", and can be as high as $10,000, a not insubstantial figure, particularly for a teacher.
 
 
 41
 In my view, the gross intrusion that this regulation exerts upon the academic environment cannot be underestimated, nor does it, in my opinion, need any further proof than its mere existence. Its chilling effect upon constitutionally protected activity is self-evident. Rule 8 requires that a legally binding decision as to the academic content of a constitutive component of teaching — the books — be made by teachers and/or the teaching institution long before the academic year commences. This is followed by an elaborate bureaucratic policing mechanism which is not only highly intrusive, but is also highly intimidating. Compounding this arctic environment, the standard for compliance — as evidenced by the definition of what constitutes a "significant change" in the text of the school books — is vague, confusing and contradictory beyond redemption. Thus, the regulation unavoidably interjects the state into dictating the content of what academia may deem to be the appropriate subject matter and method of teaching.
 
 
 42
 With due respect, I find the majority's proposed inquiry into the status of the school books in Puerto Rico's private schools to be somewhat puzzling and disconcerting. See Maj. op. at 11-13. At the very least, it would appear that there is some use of school books by private schools in Puerto Rico, otherwise the Government would not attempt to regulate their use. Furthermore, it is self-evident that simultaneous use of two different texts in or out of the classroom is, at a minimum, academically and pedagogically disruptive. What is to be gained from the line of inquisition mapped by the majority is beyond my comprehension. Moreover, with due respect, under the circumstances before us, in which we are presented with a live case and controversy (i.e., enforcement of an extant regulation), the majority's approach appears to be an unnecessary exercise and a waste of judicial resources.[2] Nor does Univ. of Penn. v. EEOC, 493 U.S. 182, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990) — a case which is factually and qualitatively distinguishable from the present circumstances — demand the inquiries mandated by the majority. In all probability, teachers faced with a figurative overhanging ax for violating this extreme measure would adapt to the regulation and endure its resulting academic babel. But this argument completely misses the point. The constitutional intrusion emanates from their being required to do so.
 
 
 43
 That teachers can be forced to deliver lessons in a clearly different, and in my opinion, obviously deficient, academic environment does not weigh against the reality of the First Amendment incursion that such action constitutes, and no amount of inquiry can change the reality of the regulation's text and its patent restrictions on academic freedom. Any other "analysis turns the First Amendment upside down." Ashcroft v. Free Speech Coalition, 535 U.S. 234, 255, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002) (Kennedy, J. concurring).
 
 
 44
 Puerto Rico, through an agency whose competency lies in consumer affairs, not education, has interfered with conduct protected by the First Amendment. With respect, I believe we should so declare and I therefore dissent.
 
 APPENDIX A
 
 45
 NOTE: OPINION CONTAINING TABLE OR OTHER DATA THAT IS NOT VIEWABLE NOTE: OPINION CONTAINING TABLE OR OTHER DATA THAT IS NOT VIEWABLE PRS ADC DACO REG. 6458, Reg. 6458-Regulations for the Disclosure of Information on the Sale and Distribution of Textbooks
 
 
 46
 *2445 P.R. Regs. DACO REG. 6458
 
 
 47
 REGULATIONS OF PUERTO RICO DEPARTMENT OF CONSUMER AFFAIRS (DACO, according to its Spanish acronym) REG.6458-REGULATIONS FOR THE DISCLOSURE OF INFORMATION ON THE SALE AND DISTRIBUTION OF TEXTBOOKS
 
 
 This database contains regulations received until December 15, 2003.
 
 
 48
 Reg. 6458 Regulations for the Disclosure of Information on the Sale and Distribution of Textbooks
 
 I.
 GENERAL GUIDELINES
 
 RULE 1 — LEGAL BASE
 
 
 49
 
 These regulations is adopted according to the powers conferred to the Secretary of the Department of Consumer Affairs as granted by Act Number 5 of April 23, 1973, as amended; and in accordance with Act Number 170 of August 12, 1988, as amended.
 
 
 RULE 2 — GENERAL OBJECTIVES
 
 50
 These regulations have the main objective of protecting Puerto Rican family and parents, and /or tutors who register their minor children and/or wards in the private schools of Puerto Rico. Likewise, it is the intent to define the obligations and responsibilities of schools, bookstores, distributors, and publishing houses in relation to the corresponding processes pertaining to the sale of textbooks. Furthermore, the powers of the Department of Consumer Affairs are clarified, and the procedures and sanctions applicable to those who do not comply with the regulations are established.
 
 RULE 3 — INTERPRETATION
 
 51
 (A) These regulations must be interpreted liberally in favor of consumers and in order to comply with the mandates of ACT Number 5, supra
 
 
 52
 (B) In case of discrepancies between the original text in Spanish and the English translation, the Spanish text will prevail.
 
 
 53
 (C) The words and phrases used in these regulations will be interpreted according to the context in which they have been used and their meaning will be according to normal everyday usage.
 
 
 54
 (D) In applicable cases, the words used in the present tense also include the future tense; those used in the masculine gender include the feminine; the singular will include the plural and the plural will include the singular.
 
 
 55
 (E) The guidelines in these regulations will be interpreted in a way in which the public policy of the Commonwealth of Puerto Rico to foment and respect educational diversity as consigned by Act Number 49 of June 30, 1988 is not compromised in any way.
 
 RULE 4 — DEFINITIONS
 
 56
 TRANSLATOR'S NOTE: The following terms appear in alphabetical order in the original document, but fall out of the same when translated.
 
 
 57
 Unless otherwise stated, the following terms will have the meaning given to them herein:
 
 
 58
 *2446 (A) Significant change in the new edition of a book — historical, technological, scientific and/or cultural changes integrated in the new edition of a book that are significant and as such cause the total or partial revision of one or several chapters or sections and/or the inclusion of one or several chapters or sections. The exclusion of chapters or sections, cosmetic changes and/or style, such as cover changes, chapter or section order, book texture and/or material does not constitute a significant change. Additions of one or several sentences to one chapter or section or through a new book edition will not be considered a significant change nor the addition of one or several drawings, graphics, tables, or photos.
 
 
 59
 (B) Publishing house — Natural person or legal person that edits a piece of work and/or book, covering publishing expenses and administering it commercially.
 
 
 60
 (C) Contract — all agreements, be it understood or work agreement, between a school and a distributor or bookstore or publishing house, be it oral or written, to coordinate the sales of books through a specific distributor, bookstore or publishing house; to grant the exclusive sale at the school through a specific distributor, bookstore or publishing house; to grant time and space in favor of a specific distributor, bookstore or publishing house for the purpose of selling books; or to preferably recommend the acquisition of books with a specific distributor, bookstore, or publishing house.
 
 
 61
 (D) Department or DACO — Department of Consumer Affairs.
 
 
 62
 (E) Distributor — all natural or legal persons dedicated to the distribution of textbooks or one who supplies to bookstores, even if said person works with retail sales, as well
 
 
 63
 (F) School — all private institutions, for-profit or not-for-profit, religious or secular, dedicated to preschool, elementary, middle and high school education or special education, within the territorial boundaries of the Commonwealth of Puerto Rico.
 
 
 64
 (G) Bookstore — all natural or legal persons dedicated to the retail sales of books, even, on a minor scale, supplies books to other businesses dedicated to book sales, as well.
 
 
 65
 (H) Book — all textbooks, dictionaries, reference books, handbooks, pamphlets, or study materials required or suggested by a school for the use of their academic programs and/or curricula.
 
 
 66
 (I) Parents — fathers, mothers, legal guardians, or any other persons who are responsible of the scholastic or academic life of a student.
 
 
 67
 (J) Secretary — the Secretary of the Department of Consumer Affairs.
 
 RULE 5 — COMPLIANCE WITH WORK DAY
 
 68
 It is expressly stated that all affirmative action required for a determined date by these regulations from a school, distributor, bookstore and/or publishing house will be transferred to the next work day if said date is on a weekend or holiday.
 
 RULE 6 — PROHIBITION
 
 69
 No distributor or bookstore or publishing house that is an exclusive distributor, producer, printer or editor of a selected book to be used by a school, may refuse to provide other distributors or bookstores a reasonable amount of copies at the prices usually applicable to wholesale.
 
 
 70
 *2447 RULE 7 — BURDEN OF PROOF
 
 
 71
 It is expressly stated that any person and/or person to whom these regulations require the compliance of a determined affirmative action or obligation will have the burden of proof that in effect said person complied to the specific acts as stipulated by these regulations.
 
 II.
 OBLIGATIONS AND RESPONSIBILITIES OF THE SCHOOL
 
 72
 RULE 8 — Obligation to provide a list of books to parents and to the Department
 
 
 73
 (A) All schools should announce the books that will be used the next school year on or before May 15 of the previous school year, if this school year starts on August or an equivalent month if the school year starts on a different month.
 
 
 74
 (B) The announcement will be done in a form prepared by the school itself and should be posted on a bulletin board in a conspicuous place in the educational institution.
 
 
 75
 (C) Also, this list will be provided on or before the date previously indicated to the Department and, to the parents, through the students themselves or attached to any communication that reaches the parents effectively on or before the required date, as stipulated by this rule.
 
 
 76
 (D) The list that will be sent to all parents will include the title of the books for the grade or grades their children will study during the next school year and this information shall include a briefing on the book, its title, author, publishing house, edition, and publishing year.
 
 
 77
 RULE 9 — Obligation to provide a booklist with their final sale price to parents and the Department
 
 
 78
 (A) In the case that the school has reached a contract agreement with a specific distributor, bookstore and/or a publishing house, the school has to inform on said situation to parents on a bulletin board located in a highly-conspicuous place, and in the form handed out by the school to the parents including booklist and that the contract is available to be examined by the parents, should the agreement be a written contract.
 
 
 79
 (B) Moreover, the school will inform, in the same bulletin board and in the same form, that said agreement or contract will in no way infringe on the parents' right to buy the books in other bookstores, and/or via other distributors or publishing houses.
 
 
 80
 (C) Schools must submit to the Department a copy of said contracts within five (5) days of their granting, when these are written.
 
 
 81
 (D) The school must place the booklist, including a full review, the title of the book, author, publishing house, edition, publication year, and the final sale price in a highly-conspicuous bulletin board no later than May 15 prior to the start of the school year, if said year starts in August; or on an equivalent month if the school year starts on a different month.
 
 
 82
 *2448 (E) Said book list, including final sale prices of books, will be submitted to the Department and to the parents on or before the May 15, prior to the start of the school year, if said year starts in August or on an equivalent month if the school year starts on a different month. Providing the list to the parents should be done through the students themselves or attached to any communication which would effectively reach the parent on or before the date required by this rule.
 
 
 83
 RULE 10 — Obligation of informing the final sale price and corrections
 
 
 84
 The sale price required by these regulations to be disclosed shall be final. Price corrections affecting this list will be divulged to parents via the bulletin board in the most conspicuous place, by the students, or by mail within ten (10) calendar days from the time when the list was handed to the parents.
 
 
 85
 RULE 11 — Obligation of informing changes in the edition
 
 
 86
 In the case which there are changes in the edition, the school will inform in the book list which of these books have different editions, what the change specifically consists of, and whether it is a significant change or not, as defined by these regulations. In case that the changes are not significant, the school has to inform the parents on said list, that they have the option of buying the previous edition.
 
 
 87
 RULE 12 — Obligation to disclose information to parents regarding school policy on textbooks an on these regulations.
 
 
 88
 All schools must disclose and notify parents, and/or any person interested in enrolling children in said school of the school policy regarding the addition, changes and modification of the textbook list. Furthermore, the school must have a copy of these regulations available in the school library.
 
 
 89
 The school must announce a sign in a visible location and with legible letters the following statement:
 
 
 90
 "This school has the obligation to inform parents the pertinent process for book sale and distribution in accordance with the Regulations for the Release of Information About the Sale and Distribution of Textbooks of DACO. A copy of these regulations is available in our library. Not complying with the rules set forth in said regulations could lead to the levying of administrative fines in accordance with the DACO Organic Law."
 
 
 91
 Said sign should not be smaller than eight and a half inches (8 1/2) by 11 inches (11) with a letter size no smaller than twenty-two (22) points.
 
 
 92
 The material to be used could be plastic, acrylic, or any other material that is not susceptible to deterioration.
 
 
 93
 All signs should be exposed in a visible area, which could include the main entrance, the bulletin board, or the school's reception area, among others. Said sign cannot be placed more than five (5) feet away from the spot where parents would have visual access to it. Furthermore, the sign should be placed between five (5) and six (6) feet from the ground.
 
 
 94
 *2449 III.
 
 
 95
 Obligations and Responsibilities of the Distributor, Bookstore and/or Publishing House
 
 
 96
 RULE 13 — Obligation to provide to the school and the Department the book list with final sale prices
 
 
 97
 Every time a school and a distributor or bookstore or publishing house agree on or enter a contract, said distributor or bookstore or publishing house must give the school and the Department, no later than April 15 prior to the start of the school year, in case that the school year starts in August, or an equivalent month should the school year start on a different month, a list indicating the final sale price of the books to be sold by said distributor, or bookstore, or publishing house. The distributor, bookstore or publishing house must submit, free of charge, a copy of said list to parents, students or anyone who requests it, be it in person, by phone or in writing.
 
 
 98
 RULE 14 — Obligation to inform the school on changes in book editions
 
 
 99
 Any bookstore, distributor or publishing house that has a contract with a school must inform the school in the aforementioned list, and within the set time frame, which books changed edition, what the change consists of, and whether this change is significant or not, as defined in these regulations.
 
 
 100
 RULE 15 — Obligation to inform the school of mistakes and/or price corrections
 
 
 101
 Any bookstore, distributor and/or publishing house that has a contract with a school must inform said school of any error and/or correction to the book list prices within ten (10) calendar days, starting from the date this list was provided to the school.
 
 
 102
 If the school is not informed about these errors and/or corrections as herein required, the bookstore, distributor and/or publishing house must honor the final price informed in the list or the two prices.
 
 
 103
 RULE 16 — Increase in the Prices Informed on the Book List
 
 
 104
 The distributor, bookstore and/or publishing house that has a contract with the school cannot increase the prices informed on the book list, unless it mediates a direct authorization from DACO. To this effect, the distributor, bookstore and/or publishing house should present a written application form before DACO's Division of Economic Studies accompanied with sufficient and truthful evidence to back said application.
 
 
 105
 *2450 RULE 17 — Book Availability
 
 
 106
 The bookstore, distributor or publishing house that has a contract with the school must make available for sale the books mentioned in the list with enough amounts to respond to the anticipated demand based upon the enrollment of students determined by the school for each grade.
 
 IV.
 VIOLATIONS AND PENALTIES
 RULE 18 — Penalties
 
 107
 Any natural or legal person, who violates any rule in these regulations, does not comply with the obligation that these regulations imposes or fails to comply with any order issued by the Secretary of this Department in virtue of what has been disposed in these regulations, will be exposed to set administrative penalties and sanctions which include the imposition of fines of no more than $10,000.00, according to Act Number 5 of April 23, 1973, as amended.
 
 RULE 19 — Corrective Action
 
 108
 Given the high public interest that implies the fact that parents obtain the information provided in these regulations no later than the above mentioned dates, the Department can take any corrective action as authorized by this Act and/or regulations by their own initiative without the need to file a complaint.
 
 V.
 MISCELLANEOUS PROVISIONS
 RULE 20 — Disclaimer
 
 109
 If any provisions of these regulations were to be declared unconstitutional or illegal by a competent jurisdictional court, said determination will neither affect nor invalidate the rest of these regulations, but instead the effect will be limited to the part, article, paragraph, or clause that would have been declared unconstitutional or illegal.
 
 RULE 21 — Consumer Protections
 
 110
 Nothing of what has been set forth in these regulations shall keep the Secretary of DACO from applying the powers and faculties conferred to him, or her, by the Organic Law which protects consumers, or stop him, or her, from carrying out his, or her, duties.
 
 
 111
 RULE 22 — Repealing Clause The Regulations for the Disclosure of Information on the Sale and Distribution of Textbooks are herein repealed. Approved on February 19, 1992, File No. 4635 at the Department of State.
 
 
 Rule 23 — Effect
 
 
 112
 
 These regulations shall take effect immediately upon its approval by the Secretary of State.
 
 
 
 In San Juan, Puerto Rico on May 1, 2002
 
 
 113
 Fernando L. Torres Ramirez, Esq.
 
 Secretary
 
 114
 Copyright 2004 West, a Thomson business. No claim to original U.S. Govt. works.
 
 TRANSLATOR'S NOTE:
 
 115
 The following information: PRS ADC DACO REG. 6458, Reg. 6458-Regulations for the disclosure of information on the sale and distribution of textbooks appears at the top of each page in the original document.
 
 
 116
 The following information: Copyright 2004 West, a Thomson business. No claim to original U.S. Govt. worksappears at the end of each page in the original document.
 
 
 117
 
 They were omitted for formatting and space reasons.
 
 
 
 
 Notes:
 
 
 [1]
 The regulation is reproduced in full in Appendix A
 
 
 [2]
 Despite being reversed, the district court will learn nothing it did not already know about the First Amendment from the majority opinion